J-S23041-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE ADOPTION OF: A.L.E. AND K.J.E., MINORS | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.C., NATURAL MOTHER | : : : : : : | |
| | : | No. 1777 WDA 2018 |

Appeal from the Decrees Entered October 22, 2018
In the Court of Common Pleas of Warren County Orphans' Court at
No(s):  A.N. No. 6 of 2018,
A.N. No. 7 of 2018

BEFORE:   BENDER, P.J.E., NICHOLS, J., and COLINS*, J.

MEMORANDUM BY COLINS, J.:                    **FILED JUNE 19, 2019**

Appellant, V.C. ("Mother"), appeals from the decrees entered on October 22, 2018, that involuntarily terminated her parental rights to her twins, A.L.E. and K.J.E. ("Children"), born October 2017,[1] pursuant to the Adoption Act.[2]  After careful review, we affirm.

### Facts

The facts underlying this appeal are as follows.  On November 29, 2017, the juvenile court entered orders adjudicating Children dependent, which were made part of the certified record for the current termination

_____

[1] The trial court also involuntarily terminated the parental rights of Children's biological father, A.J.E., but he did not file a notice of appeal nor otherwise participate in this appeal.

[2] 23 Pa.C.S. §§ 2101–2938.

_____

*   Retired Senior Judge assigned to the Superior Court.

actions as CYS Exhibits 3.[3]  In those orders, the dependency court made the

following findings of fact:

> [Children] were born prematurely[4] at Warren General Hospital [i]n October [] 2017.  They were transferred to the neonatal intensive care unit (NICU) [at Saint Vincent's Hospital in Erie[5]] for treatment for medical conditions resulting from their premature birth.  [Children] were initially on ventilators at the NICU.  They both suffer from apnea which most frequently occurs when they are being fed.  [Children]'s heart rate will slow and their breathing will cease.  Their positioning needs to be adjusted to address this.
>
> [A.L.E.] also has supraventricular tachycardia (SVT) which is an elevated heart rate.  She takes a daily medication for this condition that slows her heart rate.  Both [Children] are also lactose intolerant so they need to be fed a special formula.  During their time at the NICU, medical staff became concerned with the . . . lack of presence [of Mother and Children's biological father, A.J.E. ("Father"), (collectively, "Parents")] at the unit, the short period of time of each visit and the fact that the parents were not showing up as directed at [Children's] feeding times.  They offered unsatisfactory explanations for their short stays including that they had to leave to get personal effects from a

---

[3] CYS Exhibits 1-30, including orders from the dependency docket, were pre-admitted without objection at the beginning of the termination hearing.  N.T. at 10.  A.L.E.'s dependency docket number is CP-62-DP-8-2017; K.J.E.'s dependency docket number is CP-62-DP-9-2017.

Duplicate exhibits were entered for both termination dockets, the only differences being A.L.E.'s and K.J.E.'s identifying information, such as names and docket numbers.  The dependency orders, CYS Exhibits 3, were likewise identical, including containing matching findings of fact.

[4] Mother was 38 years old when Children were born.  Mother has no history of substance abuse.  There is no evidence to suggest that Mother consumed alcohol or other damaging substances while pregnant or that Children's premature birth was the result of any actions by Mother.

[5] *See* N.T. at 132, 162.

prior residence in Ohio, and that they needed to buy pliers so the maternal grandfather could pull a tooth. [P]arents also indicated that the expense of transportation was an issue, however they offered no satisfactory explanation for the brief periods of their visits. The staff repeatedly advised [P]arents that they needed to come more frequently and for longer periods of time, however [P]arents refused to comply. Both [Children] were to be discharged with a heart monitor to address the apnea issue and [A.L.E.]'s [SVT]. At some point, [Children]'s medical team concluded that [Children] could not be discharged to [P]arents' home as they had fed [Children] just once, had not been trained regarding the apnea issue during feeding, had not been trained in administering [A.L.E.]'s heart medication, had not been trained on the monitor, and did not fully understand [Children]'s special dietary needs. The nursing staff did not believe that the parents understood the special needs and instructions regarding [Children's] care. [Children]'s discharge was delayed as a result and the NICU demanded that they stay overnight at the unit to address these issues.

[Warren County Children and Youth Services ("CYS")] was alerted to the concerns and they became involved with the family in mid-November. The agency found [P]arents' home to be in deplorable condition with unwashed dishes, dangerous hunting equipment, piles of clutter knee to waist high throughout their apartment. Cribs were still unassembled in their boxes. CYS offered assistance with respect to transportation to and from the NICU.

The agency initiated family find and family group decision making. CYS learned that [P]arents were going to be evicted from their home at the end of November as they had numerous safety issues, noise complaints, past due rent, and [F]ather had not been approved by the housing authority for residence. CYS had an aid assist in organizing and cleaning the apartment. However, it remained in unacceptable condition at the time of their eviction a few days before the hearing. Apparently [P]arents moved in with the maternal grandparents after their eviction. (Neither parent presented any testimony at the dependency hearing). [At the time of the dependency hearing,] CYS ha[d] not had an opportunity to assess the suitability or safety of that home or obtain clearances for the individuals residing there. . . .

> Both [P]arents have significant mental health diagnoses and are receiving medication management and counselling services through Beacon Light.  Both have missed several appointments over the last few months.  [M]other has rescheduled appointments but [F]ather has not. . . . CYS [applied for and] obtained an order for emergency placement and [Children] were discharged to foster care[ with S.W. and M.W. ("Foster Mother") (collectively, "Foster Parents").[6]] . . . [F]oster [P]arents were fully trained on all of [Children's] special needs at the NICU and medical staff approved discharge to their care.  [Children's] monitors have gone off repeatedly in the foster home with the [F]oster [P]arents properly addressing the episodes.

CYS Exs. 3 at 1-3 (some formatting).  There is no indication in the certified record for the termination matter before us that Mother ever appealed the dependency order.

On December 5, 2017, CYS implemented a family service plan ("FSP") to assist with reunification.  The FSP required Mother:  (1) to attend all supervised visitation with "a diaper bag of items necessary for the care of the [C]hildren"; (2) to care for Children appropriately during supervised visits; (3) to attend anger management and parenting classes; (4) to attend medical appointments and to display an understanding of Children's medical needs; (5) to continue mental health treatment; (6) to obtain and to maintain suitable housing; (7) to "sign all requested releases"; (8) to "participate in a parenting assessment"; (9) to "treat all agency worker[s] with respect" and not to become "argumentative"; and (10) to "participate in

---

[6] CYS Exhibits 1 contained both CYS's Applications for Emergency Custody and Emergency Order for each child; both the applications and the orders were dated November 22, 2017.

announced and unannounced home visits[,]" allowing a caseworker to inspect her home during visits, if requested. CYS Exs. 7 at 2-9. A revised FSP was entered on June 5, 2018, which remained substantially the same, but noted that Mother had completed anger management and parenting classes. CYS Exs. 8 at 3.

The juvenile court conducted permanency review hearings on March 13, June 5, and September 18, 2018. CYS Exs. 4-6; N.T. at 164. Throughout this time, Children remained with Foster Parents, with Children's "current placement goal" being "return to parent" and their "concurrent placement plan" being "Adoption". CYS Exs. 4 at 1-2; CYS Exs. 5 at 1-2; CYS Exs. 6 at 1-2.[7]

At the March hearing, the juvenile court determined that Mother substantially complied with her FSP, noting that Mother "attends all supervised visits and brings a diaper bag and supplies." CYS Exs. 4 at 1-2. It continued that Mother "is trained by CYS staff with respect to [Children's] special needs" but "seeks constant reassurance she is caring for them properly"; the juvenile court determined that Mother was making "moderate progress toward alleviating the circumstances which necessitated the original placement[.]" *Id.*

_____

[7] Concurrent adoption and reunification planning is permissible and has been described by the Supreme Court of Pennsylvania as "especially useful early in the proceedings[.]" *See In re T.S.M.*, 71 A.3d 251, 269-70 (Pa. 2013).

At the June hearing, the juvenile court again determined that Mother substantially complied with her FSP, attending all but two of her scheduled twice-weekly, three-hour supervised visits; the two that she missed were for health reasons. CYS Exs. 5 at 1-2.[8] Nevertheless, the juvenile court found "no improvement in her ability to care for [C]hildren" and "no progress toward alleviating the circumstances which necessitated the original placement[.]" *Id.* Mother's supervised visitation schedule was reduced from twice per week to twice per month. *Id.* at 3.

On August 1, 2018, CYS filed petitions to involuntarily terminate Mother's parental rights to Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (5). The petitions made no mention of 23 Pa.C.S. § 2511(b).

On August 6, 2018, the trial court appointed Attorney Cynthia Klenowski to serve both as Children's legal interest counsel and as their guardian *ad litem*, representing their best interests. *See In re L.B.M.*, 161 A.3d 172, 173-75, 180 (Pa. 2017) (plurality) (courts must appoint counsel to represent the legal interests of any child involved in a contested involuntary termination proceeding; a child's legal interests are distinct from his or her best interest, in that a child's legal interests are synonymous with

---

[8] According to the findings of the permanency review order dated June 5, 2018, Father "relocated to Ohio shortly after the March 13th review hearing. He has had no contact with [Children], CYS, or his counsel since then." CYS Exs. 5 at 1.

the child's preferred outcome, and a child's best interest must be determined by the court); ***see also In re T.S.***, 192 A.3d 1080, 1089-93 (Pa. 2018) (a child's statutory right to counsel is not waivable, even where the child is too young or nonverbal to communicate his or her preference; reaffirming the ability of an attorney-guardian *ad litem* to serve a dual role and represent a child's non-conflicting best interests and legal interests); ***In re G.M.S.***, 193 A.3d 395, 399-400 (Pa. Super. 2018) (orphans' court not required to appoint separate attorney to represent Children's legal interests, so long as children's guardian *ad litem* was an attorney and children's legal and best interests did not appear to be in conflict).

At the September permanency review hearing, the juvenile court once again determined that Mother substantially complied with her FSP, attending all supervised visits and was "compliant with her own mental health appointments and medications." CYS Exs. 6 at 1-2. However, Mother had moved into another residence with a male roommate, unrelated to Children, and the dependency court found "[t]here has been minimal progress toward alleviating the circumstances which necessitated the original placement[.]" CYS Exs. 6 at 1-2. There is no indication in the certified record for the termination matter before us that Mother appealed any of the permanency review orders.

On October 22, 2018, the trial court held a joint evidentiary hearing for both termination petitions. Mother was present at the hearing and represented by counsel.[9]

The termination hearing commenced with the testimony of Peter von Korff, Ph.D.; the parties stipulated to Dr. von Korff's qualifications as an expert witness in clinical psychology. N.T. at 16. On January 26 and February 9, 2018, Dr. von Korff met with Mother and performed psychological evaluations. CYS Exs. 12 at 1; N.T. at 17. On June 19, 2018, Dr. von Korff met with Mother and Children and performed a bonding assessment. CYS Exs. 31 at 1; N.T. at 17.[10]

Dr. von Korff testified that Mother reported to him that she believes that she has autism but that she has never been formally diagnosed. N.T. at 21 ("As a parent, I found her to be quite limited . . . by virtue of her self-reported autism.").[11] The doctor noted that his observations of her were "consistent with that diagnosis." *Id.* In his written report from Mother's psychological evaluation, Dr. von Korff wrote that Mother "has been diagnosed" with autism. CYS Exs. 12 at 2. However, he also wrote that, "in

_____

[9] Father was not present but was represented by counsel.

[10] CYS Exs. 31, copies of Dr. von Korff's written report from the bonding assessment, were admitted into evidence without objection. N.T. at 17-18.

[11] Neither Dr. von Korff nor CYS pursued any additional testing for Mother to confirm or to refute that Mother is autistic.

childhood, [Mother]'s autism was met with incomprehension, rejection and blame." ***Id.*** at 8. He quotes Mother's statement to him that her autism may have not been diagnosed, because her father "considers psychology all guesswork and telling people how to live." ***Id.*** This psychological evaluation report concludes that Mother's "disability went unrecognized, and she failed to receive both professional intervention and sensitive parenting." ***Id.*** at 11. In the written report from the later bonding assessment, Dr. von Korff wrote that Mother "continues to present as an individual challenged by autism and limited personal resources." CYS Exs. 31 at 8.

Dr. von Korff testified that "she is significantly limited by her autistic frame of reference" with "a paint by numbers quality . . . to her parenting." N.T. at 21-22. He further explained, "Like many autistic individuals, [Mother] has difficulty making herself clear. She tends to actually over report some information that is really not quite helpful" in providing a "clear answer . . . to an inquiry." ***Id.*** at 22; ***see also*** CYS Exs. 12 at 2-3 (Mother was "prone to circumstantial and tangential speech"; "[t]his is a characteristic associated with autism"; "[a]ustistic speakers are inclined to offer more detailed information than necessary, to speak in platitudes, and to cite external sources of authority in support of their opinions"; Mother's "difficulties in collaborating . . . were consistent with her autism diagnosis"). He felt she had a "classic autistic disconnect between abstract thinking and functional realities." ***Id.*** at 56.

Dr. von Korff described Mother as "an earnest individual" and "[s]omeone well-intentioned" and "intelligent." N.T. at 21-22, 55. However, he observed that Mother appeared unaware of "how to sense [Children]'s emotional needs" or "[h]ow [Children] tend[] to react", although he admitted that he "think[s] this is a function of her autism" as "her status as an autistic individual[] precludes her from recognizing social cues[.]" *Id.* at 23-24, 40, 42; *see also* CYS Exs. 12 at 2, 9 (autistic individuals "have trouble reading social cues"; Mother reported to Dr. von Korff that "[i]t's hard to learn to socialize when you don't really read body language and facial expressions"). For example, Dr. von Korff was critical of Mother's belief that handing Children teething rings was sufficient to meet Children's emotional needs. N.T. at 48.

Dr. von Korff testified that, during the bonding assessment, Mother was unable to parent both Children at the same time, sitting A.L.E. in a walker while she unsuccessfully attempted to feed K.J.E. a bottle. *Id.* at 26-38. He observed that, while Mother was intent and gentle with K.J.E., she completely ignored A.L.E.; even when A.L.E. began to cry, Mother still did not recognize that A.L.E. needed contact. *Id.* at 36-43.

Despite these shortcomings observed by Dr. von Korff, Mother told the doctor that "she felt that she had absorbed what they had to teach her" during her parenting classes. *Id.* at 47. Dr. von Korff further testified there was a disconnect between Mother's positive self-assessment and her actual performance. *Id.* at 49.

Dr. von Korff also believed that Mother presented a safety concern and "wonder[ed] how she would function with three children."[12]  *Id.* at 49-51. He testified that, if Mother "were able to have a significant level of . . . hands on training, she might be able to pick up" some of the skills required to parent Children appropriately, but he had "concern about her ability" to learn new skills, particularly as Mother indicated that she had already completed classes, read a great deal, and had support.  *Id.* at 49.

On cross-examination, Dr. von Korff testified that he is "less acquainted with the services that are provided here in the Warren area than . . . in the Erie area" to help parents who have difficulty with emotional connection.  *Id.* at 61.  The doctor gave an example of a program in Erie called "Project First Step," which "specifically targets this type of challenge, and there is a lot of individual work.  There is group work.  There is training. There is education."  *Id.*  He continued to explain the program:

> [T]here is also a very close attention to learning these types of skills.  Sometimes they use the computerized baby . . . pre-birth to kind of give . . . the parent a chance to demonstrate where their functional level is at.
>
> But, they also do a lot of post-natal work and following up and seeing to it that . . . not just the basics are managed, but rather, that the emotional and attachment needs of the child are being met.

*Id.*

_____

[12] Mother cares for her older child, eight-year-old X.C., who was not the subject of a termination petition.

The trial court asked Dr. von Korff about the effect of Mother's autism on her parenting abilities:

[THE COURT:]    There has been testimony in the past that she had a difficult time accepting instruction and redirection on more special needs, medications, heart monitors, things of that nature.

Is that consistent with the autism spectrum diagnosis? . . .

THE WITNESS:    Your Honor, I, I am aware of that history. . . . I doubt that was involved, that was attributable to the autistic diagnosis.  I think more it had to do with the generally chaotic circumstances in [Mother]'s life.

The relationship that she had with [Father].  And, a variety of situational factors, as well as this piece that we keep returning back to.  A kind of inadequate appreciation of the importance of emotional and physical contact.

You know, a parent who seizes on every opportunity to visit the NICU and be with the child is attempting to begin that bonding process.  And I think for [Mother], the importance of that is really obscured.

THE COURT:    When you have someone with autism who doesn't have their own individual need for that type of emotional interaction, how do you train them to perceive that their children or people they are involved in do have that need?

THE WITNESS:    Again, I think it would be a tough project. I have used this phrase several times, a kind of paint by numbers approach.

I think that serves her well with regard to diapering and feeding and maybe bed times and things like that.  But, to appreciate the nuance, I think she is going to be limited even with good training.

Perhaps the very best that one could hope for is that she would be cued in into some behaviors such as eye contact, animated voice, and so forth.

That would at least move in the direction that we would optimally want to see.

THE COURT:      Is there anything in the professional literature that children of an autistic parent, parents are more likely to develop attachment issues?

THE WITNESS:   You know, I can't give you a reference, [Y]our Honor.  I am not able to do that.  I would imagine that there is.  And I don't have that information.

*Id.* at 66-68.

Furthermore, Dr. von Korff observed that Children's relationship with Foster Parents is warm, immediate, and secure.  *Id.* at 63.   He noted Children are in a very supportive and nurturing environment, and are doing well.  *Id.* at 70.  Dr. von Korff believed that Mother's approach to parenting would result in an insecure attachment between Children and Mother, potentially resulting in long-term issues for Children, including mental health difficulties, relationship difficulties, and substance abuse.  *Id.* at 69.  Dr. von Korff additionally opined that severing contact with Mother would not significantly disrupt Children.  *Id.* at 70.

Mary Burrows, a foster care specialist with the foundation that placed Children with Foster Parents, testified that she witnessed deficiencies in Mother's ability to feed Children, *id.* at 81, including Mother not knowing "the amount of formula they might be taking" and "attempting to feed them" in a "position" that was not "safe[.]"  *Id.* at 99-100.[13]   Burrows also attended a doctor's visit where there was what she described as "a safety

_____

[13] Burrows did not clarify why the feeding position was not safe, including whether it was related to Children's apnea.  *See id.* at 99-100.

concern:" Mother placed both children on the exam table together, diverted her attention from K.J.E., and then needed an intervention from both Burrows and Foster Mother to keep K.J.E. from falling off the table. *Id.* at 82-83. Further, during doctor's appointments, Burrows observed Mother had difficulty providing basic information regarding Children, such as their birth date. *Id.* at 86. Burrows opined that Mother could not adequately care for Children in an unsupervised setting. *Id.* at 96.

Next, Nancy Rogowski, a court-appointed special advocate for Children, *id.* at 111, testified that Mother was only able to focus on one child at a time. *Id.* at 119. For example, during Mother's last visit with Children prior to the termination hearing, while Mother was feeding K.J.E., Mother turned her back to A.L.E. and was oblivious to the fact that A.L.E. fell over backwards and hit her head on the rug. *Id.* at 122-23. Rogowski agreed with Burrows that Mother could not adequately care for Children without supervision. *Id.* at 123.

Foster Mother also testified. She stated that she has cared for Children since they were released from the hospital in November 2017. *Id.* at 132. Foster Mother testified about the significant medical care Children initially required, as well as the current medical concerns regarding Children, including the fact Children lose weight rapidly if not fed appropriately. *Id.* at 132-44. Foster Mother divulged that Children had not needed apnea monitors since April 2018. *Id.* at 149.

Foster Mother continued that, initially, Mother visited twice per week but the number of visits was reduced. *Id.* at 154. She explained:

From my understanding, we were pulling them back because [Children] were having a hard time getting through the visit and staying calm. They were very agitated a lot of the time. They weren't eating.

For me, one of the frustrations was having two visits a week, we were constantly struggling with pulling their weight back up. Every time we had a visit, their weight would stagn[ate]. Go stagnant or go down. And then we had to struggle to get them back up.

With pulling the visits down, that's where we have had their significant weight gain. We have been able to get them on a nice schedule.

*Id.* at 154-55. Foster Mother testified that, in November 2017, Children's weight was in the first percentile, and, as of the date of the hearing (October 2018), their weight was in the tenth percentile. *Id.* at 133.

A CYS caseworker, Kylei Davison, testified that the agency conducted a family team meeting in November 2017 to ensure Parents spent sufficient time with Children before their anticipated discharge from the hospital and to confirm that Parents could appropriately care for Children at home. *Id.* at 163-64. Davison continued that, since December 2017, Mother was never able to complete a feeding, never showed any progress in terms of feeding Children, consistently had difficulties making formula, and continued to hold Children inappropriately during feedings. *Id.* at 169-71. She felt that "[t]he retention of information regarding the feedings . . . was a struggle from visit to visit[,]" even though visits were occurring "twice a week." *Id.* at 170.

- 15 -

Davison also observed that Mother could not maintain safety during supervised visits, allowing Children to play with plastic bags and to touch electric cords, and that Mother continued to struggle with detecting A.L.E.'s heart rate, often listening to the wrong side of A.L.E.'s body. *Id.* at 188-90. Davison concluded that, despite substantial assistance, Mother did not make progress and did not demonstrate an ability to care for Children appropriately. *Id.* at 192-93. Davison explained that Mother's visits never progressed to being unsupervised and that several visits were supervised from an observation room, which caseworkers had to leave several times during these visits to provide hands-on assistance to Mother. *Id.* at 195.

Davison testified that she (Davison) met with one of CYS's "intellectual disability supervisors[,]" Ronna Tipton,[14] who "has knowledge of autism" and "is running the program through the county to help youth and adults with autism and navigate services better." *Id.* at 192-93. Davison continued that Tipton gave her "a bunch" of websites, YouTube sites, and reading material about coaching "somebody who has lived their life this entire way" to learn "basic body language for babies and how to read them." *Id.* at 193. Davison stated that she then gave the web addresses and reading material to Mother. *Id.*

---

[14] No evidence was presented that Tipton ever met with Mother or directly instructed Mother, and Tipton did not testify during the hearing.

On cross-examination, Davison admitted that there were no services in Warren County comparable to those in Erie County described by Dr. von Korff. *Id.* at 200. She acknowledged that Mother transports herself to and from visitations and Children's medical appointments. *Id.* at 202.

Mother testified on her own behalf. She stated that she went to Saint Vincent's Hospital in Erie as often as she could and did all of Children's care while she was there, "[t]o the point where several nurses would just leave the area, or [go] somewhere else in the ICU when [she] was there." *Id.* at 207. She continued that she fed Children and that they "finish[ed] their bottles" for her while still in the hospital. *Id.*

Mother testified she received "full training" about Children's heart monitors at the hospital, including how to charge the monitors, how to turn off the alarms, how to check the alarms, and how to save the data from the monitors. *Id.* She added that, after the full training, she had a review session while Children were in still in the hospital and another training session after they were released. *Id.* at 207-08.

Mother continued that she attended all visitations, which were originally scheduled twice a week but were reduced to twice a month. *Id.* at 208. She asserted that visitation was cancelled only if Children were sick or due to inclement weather, such as "the snow storm that shut down Erie." *Id.*

Mother acknowledged that, by the time of the termination hearing, there was no bond between herself and Children: "We had a bond and, obviously, that doesn't exist anymore." *Id.* at 207. She admitted that Children "haven't finish[ed] a bottle for [her]" during visitation. *Id.* at 209.

Children's maternal aunt, W.S., testified that Mother had autism and that Mother's other child, X.C., stayed with her while Mother visited Children. *Id.* at 228, 239. Children's maternal grandmother, N.J., testified that she would be able to support Mother and that Mother's housing situation was secure. *Id.* at 250.

Attorney Klenowski stated that she could not ascertain Children's preferred outcomes, because they were "one-year-old infants with an extremely limited vocabulary, mostly baby talk, and . . . a few minor words here and there." *Id.* at 259. She asserted that the best interests of Children would be met by terminating Parents' parental rights. *Id.*

At the conclusion of the hearing, the trial court acknowledged that Mother has "substantially complied" with her FSP. *Id.* at 271. The trial court then made the following additional findings:

> [Mother] has gone to all or most visits, particularly after winter. Most recently she is attending all visits. She is going to all or most medical appointment for [Children].
>
> She took parenting classes. She addressed her own mental health needs with psychotropic medications, counseling, had a job . . .
>
> And, basically, was doing what the agency requested of her. . . .

> There is no doubt in my mind she cares for these children. She has made the best effort she could after placement under these circumstances to seek reunification.

*Id.* at 271-72. Despite Mother's compliance, the trial court concluded Mother did not make any progress towards reunification, focusing on her inability to provide Children with appropriate care for their "emotional needs" and "attachment issues." *Id.* at 272. It continued: "So, these are [children] that need and will continue to need more than basic parental care giving. More than an attempt at feeding, a best efforts at medical needs that require more than that." *Id.* at 274. After acknowledging that Mother is "on the autism spectrum[,]" *id.* at 276, the trial court recounted the efforts of CYS, *id.* at 277, and ultimately held that Mother "cannot remedy her current incapacity" to parent Children. *Id.* at 282.

The trial court then set forth its "consideration under 2511(b)." *Id.* at 284. The trial court observed that there appeared to be a limited attachment between Mother and Children, ultimately crediting Dr. von Korff's testimony that Children would not suffer any type of harm if Mother's parental rights were terminated. *Id.* at 284. The court also noted concerns about Mother bonding with Children and forming appropriate attachments. *Id.* The court observed that Children are happy, attached, and doing well in their foster home. *Id.* at 285-86.

At the conclusion of the hearing, the trial court stated that it "will be signing a decree that the parents' rights to the children are terminated." *Id.* at 286-87.

**Written Termination Decrees**

The written decrees involuntarily terminating Mother's parental rights to Children, dated October 22, 2018, stated that Mother's rights were terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (5). The written decrees made no mention of 23 Pa.C.S. § 2511(b). As explained in more detail below, "[o]ur case law has made clear that under Section 2511, the court **must** engage in a bifurcated process prior to terminating parental rights." *In re B.J.Z.*, 2019 PA Super 106, *10 (filed April 4, 2019) (emphasis added) (citation omitted). Consequently, we could vacate the order and remand this case due to the trial court's failure to include any reference to Subsection 2511(b) in its decrees terminating Mother's parental rights. However, as the trial court mentioned its "consideration under 2511(b)" during the termination hearing immediately prior to announcement that it would execute termination decrees, N.T. at 284, 286-87, we will accept that the trial court performed the required bifurcated analysis pursuant to § 2511 and will not permit the trial court's oversight in its written decrees to preclude us from reaching the merits of Mother's appeal.

**Docket Entries**

We observe that the docket entries do not comply with the rules regarding entry of orders. *See* Pa.R.A.P. 108(b), 301(a)(1); Pa.R.C.P. 236(b). Neither certified docket indicates that the subject decrees were ever mailed to the parties, including Mother, or that the parties were otherwise given notice of the decrees. The appeal period in this case thus was never

formally triggered.  **See Frazier v. City of Philadelphia**, 735 A.2d 113, 115 (Pa. 1999) ("pursuant to the express terms of the rules, an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given").  Yet, at this juncture, it would be a waste of judicial resources to remand the matter solely for the entry of Rule 236(b) notice, because it is readily apparent that Mother was aware of the decrees.  Accordingly, in the interest of judicial economy, we regard as done what should have been done and address the Mother's appeal.

### Pa.R.A.P. 1925(a)(2)(i)

On November 8, 2018, Mother timely filed one notice of appeal listing two separate docket numbers – A.N. No. 6 of 2018 for A.L.E. and A.N. No. 7 of 2018 for K.J.E.  Mother failed to contemporaneously file her concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).  On November 14, 2018, the trial court issued an order allowing Mother two days to file her concise statement of errors complained of on appeal; Mother filed her concise statement on November 16, 2018.  Although Mother violated our Rules of Appellate Procedure, we choose not to dismiss the instant appeal as appellate review is not impeded.  **See In re K.T.E.L.**, 983 A.2d 745, 748 (Pa. Super. 2009).

### No Trial Court Opinion

The trial court elected not to enter an opinion.  In a one-paragraph filing dated November 19, 2018, and labelled "Memorandum Opinion Pursuant to Pa.R.App.P. 1925(b)," the trial court stated that it "fully

addressed all issues complained of on appeal on the record at the termination hearing." While this Court understands the demand placed upon small county courts, this Court is shocked that, given the magnitude of a termination of an individual's parental rights, the trial court did not file an opinion.

*Commonwealth v. Walker*

On December 19, 2018, this Court entered a *per curiam* rule to show cause why this appeal should not be quashed pursuant to ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018), and Pa.R.A.P. 341, because the appeal "has been filed from two different lower court docket numbers." Rule to Show Cause, 12/19/2018. On December 21, 2018, Mother's counsel sent a letter to our Prothonotary in response:

> The appeal should not be quashed as the cases were heard by the same court for the termination of parental rights, involving the same mother, her two children, with the same issues. . . .
>
> . . . ***Walker*** . . . is inapposite because the facts of that case involve a suppression order involving four different criminal defendants, and the results of the appeal would cause different impacts upon the individual defendants. . . .
>
> There is no such impact in the present appeal. The appeal involves the same mother and her children, and her rights regarding each child would not be affected by a ruling on the other child.
>
> If the court is to quash the appeal, counsel would request that the court grant leave for the Appellant's counsel to file separate appeals for the two children, in order to preserve the rights of the Appellant in this matter.

Letter from Alan M. Conn, Esquire, to Joseph D. Seletyn, Esquire, Prothonotary (December 21, 2018) at 1. Children's counsel also responded, advocating for quashal. Children's Brief at 2-4. On April 9, 2019, this Court entered an order discharging the rule but stating that the merits panel may revisit the issue of whether Appellant's notice of appeal ran afoul of *Walker*.

> The Official Note to Rule 341 of the Pennsylvania Rules of Appellate Procedure provides in relevant part:
>
>> Where, however, one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeals must be filed. ***Commonwealth v. C.M.K.***, 932 A.2d 111, 113 & n.3 (Pa. Super. 2007) (quashing appeal taken by single notice of appeal from order on remand for consideration under Pa.R.Crim.P. 607 of two persons' judgments of sentence).
>
> Pa.R.A.P. 341, Official Note.
>
> Until recently, it was common practice for courts of this Commonwealth to allow appeals to proceed, even if they failed to comply with Pa.R.A.P. 341.
>
>> While our Supreme Court recognized that the practice of appealing multiple orders in a single appeal is discouraged under Pa.R.A.P. 512 (joint appeals), it previously determined that "appellate courts have not generally quashed [such] appeals, provided that the issues involved are nearly identical, no objection to the appeal has been raised, and the period for appeal has expired." ***K.H. v. J.R.***, 826 A.2d 863, 870 (Pa. 2003) (citation omitted).
>
> ***In the Interest of: P.S.***, 158 A.3d 643, 648 (Pa. Super. 2017) (footnote omitted).
>
> However, on June 1, 2018, our Supreme Court in ***Walker*** held that the practice violated Pennsylvania Rule of Appellate Procedure 341, and the failure to file separate notices of appeal for separate dockets must result in quashal of the appeal. ***See Walker***, 185 A.3d at 977. The Court stated unequivocally: "The Official Note to Rule 341 provides a bright-line mandatory

- 23 -

instruction to practitioners to file separate notices of appeal. . . . The failure to do so requires the appellate court to quash the appeal." *Id.* at 976-77.

Because the mandate in the Official Note was contrary to "decades of case law from this Court and the intermediate appellate courts," the *Walker* Court announced that its holding would apply prospectively only. *Id.* at 977. Accordingly, *Walker* applies to appeals filed after June 1, 2018, the date *Walker* was filed. *Id.*

\* \* \*

2 We recognize the harsh - perhaps draconian - consequence of quashing any appeal, and in particular an appeal involving a party's parental rights. However, our role as an intermediate appellate court is clear. "It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Such is a province reserved to the Supreme Court." *Moses v. T.N.T. Red Star Exp.*, 725 A.2d 792, 801 (Pa. Super. 1999). It is well-settled that "the Superior Court is an error correcting court and we are obliged to apply the decisional law as determined by the Supreme Court of Pennsylvania." *Commonwealth v. Montini*, 712 A.2d 761, 769 (Pa. Super. 1998).

*In re M.P.*, 204 A.3d 976, 980-81 & n.2 (Pa. Super. filed February 22, 2019).

In *M.P.*, *id.* at 980, this Court "remind[ed], advise[d] and emphasize[d] to all litigants who seek appellate review with this Court – whether in criminal, civil or family cases – that *Walker* is the law of the Commonwealth, and shall be applied prospectively and uniformly by this Court." Despite admitting that "*Walker* compels quashal[,]" *M.P.* reached the substantive issues presented for review, because this Court acknowledged that, prior thereto, the "decisional law may have been unclear to this point[.]" *Id.* at 981.

Mother's notice of appeal was filed November 8, 2018 – after the deadline of *Walker* (June 1, 2018) but before the strongly worded ultimatum of *M.P.* (February 22, 2019). While we acknowledge that *Walker* compels quashal in the current action, since Mother's notice of appeal predated *M.P.* and since *M.P.* conceded that the decisional law may have been unclear prior thereto, we will reach the substantive issues that Mother presents for review.[15] *But see Commonwealth v. Williams*, 2019 PA Super 81, *4 (filed March 20, 2019) (quashed appeal in accordance with Pa.R.A.P. 341 and *Walker* when notice of appeal filed June 5, 2018 -- only four days after the *Walker* deadline; by comparison, notice of appeal in current appeal filed five months after *Walker*). Given the severity of a termination of parental rights, we have chosen to be **extremely** liberal and magnanimous in our interpretation of our case law and procedural rules as we will decline to quash Mother's appeal.

## Mother's Brief

Mother's brief to this Court does not adhere to our Rules of Appellate Procedure. It is missing multiple required sections, including the

---

[15] We are aware that *M.P.* is not precisely on point. In *M.P.*, the appellant was appealing from termination and goal change orders for two children and therefore should have filed four distinct notices of appeal; she filed separate notices of appeal for each child but combined the notices of appeal for each children's termination and goal change orders. 204 A.3d at 980-81. In the current case, Mother failed to file separate notices of appeal for each child. Nevertheless, we believe that this distinction does not preclude us from considering *M.P.*'s *Walker* analysis.

"[s]tatement of both the scope of review and the standard of review[,]" the "[s]ummary of argument[,]" and "[t]he certificates of compliance required by Pa.R.A.P. 127 and 2135(d)." Pa.R.A.P. 2111(a)(3), (6), (12). Additionally, the "[o]rder or other determination in question" appears out of sequence in the brief. Pa.R.A.P. 2111(a)(2). Also, in the statement of questions involved, our rules require that "[e]ach question shall be followed by an answer stating simply whether the court or government unit agreed, disagreed, did not answer, or did not address the question[,]" which Mother's brief fails to do. Pa.R.A.P. 2116(a).

> The briefing requirements scrupulously delineated in our appellate rules are not mere trifling matters of stylistic preference; rather, they represent a studied determination by our Court and its rules committee of the most efficacious manner by which appellate review may be conducted so that a litigant's right to judicial review as guaranteed by Article V, Section 9 of our Commonwealth's Constitution may be properly exercised.

*Commonwealth v. Briggs*, 12 A.3d 291, 343 (Pa. 2011).

Again, we could quash for these multiple deficiencies within Mother's brief; nonetheless, we will not do so, as Mother has supplied us with enough of a brief to allow us to comprehend her claims and to provide meaningful review. *Compare Branch Banking and Trust v. Gesiorski*, 904 A.2d 939 (Pa. Super. 2006) (this Court was unable to conduct meaningful review and quashed appeal, where appellants' *pro se* brief failed to include a scope and standard of review, the order appealed from and its accompanying opinion, and what questions they wished this Court to resolve), *and*

- 26 -

*Commonwealth v. Greenwalt,* 796 A.2d 996 (Pa. Super. 2002) (this Court was unable to conduct meaningful judicial review where "[w]ith the exception of what purports to be a statement of the case and an attached trial court opinion, Appellant has failed to meet any of the requirements specified in Rule 2111. Appellant's brief contains nothing more than a list of facts presented in the light most favorable to her."; appeal quashed), *with Commonwealth v. Snyder*, 870 A.2d 336 (Pa. Super. 2005) (this Court did not quash appeal despite appellant's failure to comply with the briefing rules of appellate procedure, where this Court could still address a subset of issues raised), *and Ty-Button Tie, Inc. v. Kincel and Co.*, 814 A.2d 685 (Pa. Super 2002) (this Court addressed appellant's claims, despite several deficiencies within appellant's brief, including failure to include a statement of court's scope and standard of review and only sparse citation to relevant case law).

## Termination of Parental Rights

Mother presents the following issue for our review:

Has the burden of proof been met by clear and convincing evidence that termination of parental rights is warranted, as [M]other has shown that she is able to care for [C]hildren, has addressed a number of issues in her life that [CYS] indicated need[] correcting, and given that [C]hildren have reduced medical needs as they advance in age?

Mother's Brief at 6.

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse

of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result.

**B.J.Z.**, 2019 PA Super 106, *9-*10 (internal quotation marks and some internal citations omitted) (some formatting).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). We will affirm if we agree with the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a) and its decision as to § 2511(b). **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In the current case, we affirm the trial court's decision to terminate Mother's parental rights to the Child under subsections 2511(a)(2) and (b), which provide:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*    \*    \*

**(b) Other considerations.—**The court in terminating the right of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(2), (b).

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

***G.M.S.***, 193 A.3d at 401 (citation omitted).

<u>Section 2511(a)</u>

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to

affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

*In re T.L.C.*, 199 A.3d 1270, 1278 (Pa. Super. 2018).

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012).

In the instant appeal, the trial court acknowledged Mother's substantial compliance with her FSP goals but concluded that she did not make any progress towards reunification, focusing on her inability to appropriately care for Children's emotional and physical needs. N.T. at 271-74. The trial court ultimately concluded Mother suffers from a parental incapacity she cannot remedy. *Id.* at 282.

Mother argues there was insufficient evidence to support the termination of her parental rights under section 2511(a)(2). Mother's Brief at 7-10. She claims that she made efforts to alleviate her issues with housing and employment and observes that the trial court concluded she substantially complied with the goals identified for her by CYS. *Id.* at 8. Mother claims she attended visits, made efforts at parenting, and was able to meet Children's physical needs. *Id.* at 7-10. While Mother acknowledges there are areas she needs to "work on," she argues that "she made progress

and was able to prepare a bottle and meet [C]hildren's physical needs." *Id.* at 8-9.

Contrary to Mother's argument, the record supports the trial court's conclusion that Mother suffers from a parental incapacity she cannot remedy. Burrows, Davison, and Foster Mother all testified that, despite assistance, Mother was never able to feed Children, who lost weight rapidly if not fed properly, and made no progress towards learning how to feed Children, including even how to hold Children during feeding. N.T. at 81, 99-100, 132-44, 154, 169-71, 192-93. Dr. von Korff also observed an incident when Mother was unable to feed K.J.E., *id.* at 36-38, and Mother herself conceded that Children have not "finished a bottle" for her during visitation. *Id.* at 209. Additionally, Burrows, Davison, and Rogowski all agreed that Mother never showed any ability to care for Children appropriately in an unsupervised setting, *id.* at 96, 123, 192-93,[16] and Dr. von Korff likewise "wonder[ed] how she would function with three children" simultaneously, *id.* at 49, given that he had witnessed her inability to care for the two Children at once. *Id.* at 36-43. Ergo, when within her control, Mother has caused Children "to be without essential care . . . or

---

[16] Although Mother's testimony about her ability to care for Children while they were in the NICU contradicts the testimony of CYS's witnesses, N.T. at 207-08, "[t]he trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *B.J.Z.*, 2019 PA Super 106, *10.

subsistence necessary for [their] physical . . . well-being" and these conditions were not "remedied by" Mother. 23 Pa.C.S. § 2511(a)(2).

Instead, this "essential care" and "subsistence[,]" *id.*, has been provided through foster care since Children were released from the hospital in November 2017. CYS Ex. 3 at 3; N.T. at 132. Foster Mother testified that she – not Mother – has provided Children with their significant medical care and who had made sure that Children eat so that their weight did not decrease nor stagnate. N.T. at 132-44, 154.

Besides their physical well-being, Dr. von Korff also expressed that Mother's parenting approach could have long-term effects on Children's mental health. *Id.* at 69. Mother hence would also cause Children to be without the care necessary for their "mental well-being." 23 Pa.C.S. § 2511(a)(2).

Moreover, Mother's behavior did not change, despite her completion of parenting classes. CYS Exs. 8 at 3. Dr. von Korff testified to Mother's disconnect between her actual performance and her self-evaluation, N.T. at 47, 49, 56; Mother thus demonstrated a "repeated and continued incapacity" to change, which may be rooted in her inability to assess her own performance objectively. 23 Pa.C.S. § 2511(a)(2).

Therefore, the decision of the trial court fulfills the three elements that must be met to terminate parental rights pursuant to 23 Pa.C.S § 2511(a)(2) according to *T.L.C.*, 199 A.3d at 1278: (1) Mother's "repeated

and continued incapacity" (2) has caused Children "to be without essential parental care . . . or subsistence necessary for [their] physical or mental well-being[,]" and (3) "cannot or will not be remedied by" Mother. That decision "is supported by competent evidence[,]" ***B.J.Z.***, 2019 PA Super 106, *9, from Burrows, Davison, Dr. von Korff, Foster Mother, and Rogowski. While Mother asserts that Children's medical needs are decreasing, making their care easier, Mother's Brief at 10, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." ***In re K.Z.S.***, 946 A.2d 753, 759 (Pa. Super. 2008); ***see also In re J.T.***, 817 A.2d 505 (Pa. Super. 2003) (where record supported conclusion that mother was unable to care for children without continued CYS involvement, termination was proper). Based on the foregoing, we conclude that there is no merit to Mother's claims that CYS failed to establish the elements of 23 Pa.C.S. § 2511(a)(2).

### *Section 2511(b)*

Next, we proceed to consider the sufficiency of the evidence to support the termination of Mother's parental rights pursuant to Section 2511(b). 23 Pa.C.S. § 2511(b).

After noting that Section 2511(b) prohibits parental rights to "be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be

beyond the control of the parent[,]" Mother contends that "certain factors were beyond [her] control" and that "she did make considerable efforts in those areas that were within her control." Mother's Brief at 7-8.

Albeit that Mother's argument relating to Section 2511(b) is not comprehensive, we believe it is enough to preserve a challenge to this subsection. To the extent that it could be considered insufficient to preserve such a challenge, we would excuse any such deficiency, because Mother may have been uncertain as to whether any such argument were needed, as CYS failed to include any explicit citation to 23 Pa.C.S. § 2511(b) in its termination petitions and as the trial court failed to reference § 2511(b) in its written termination order.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional **needs and welfare** of the child. As this Court has explained, Section 2511(b) **does not explicitly require a bonding analysis** and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless **only one of many factors to be considered** by the court when determining what is in the best interest of the child.
>
> In addition to a bond examination, **the trial court can equally emphasize the safety needs of the child**, and should also consider the intangibles, such as the love, comfort, **security**, and stability the child might have with the **foster parent**. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child **bond** can be **severed without detrimental effects** on the child.

- 34 -

***G.M.S.***, 193 A.3d at 401 (citations and internal brackets omitted) (emphasis added) (some formatting).

"The mere existence of an emotional bond does not preclude the termination of parental rights. . . . [T]he orphans' court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (citations omitted). "Ultimately, the concern is the needs and welfare of a child." ***M.P.***, 204 A.3d at 983 (citation omitted).

In the current matter, Davison testified that Mother could not maintain safety during supervised visits, allowing Children to play with plastic bags and to touch electric cords, and continued to struggle with detecting A.L.E.'s heart rate, sometimes listening to the wrong side of A.L.E.'s body. N.T. at 188-90. Burrows described "a safety concern" that occurred during a doctor's visit, where Mother failed to prevent K.J.E. from almost falling off an exam table. ***Id.*** at 82-83. Burrows also "[did]n't believe that . . . the position that [Mother] was attempting to feed [Children] in was safe, as well." ***Id.*** at 99-100. Dr. von Korff further believed that Mother presented a safety concern. ***Id.*** at 49-51. The safety needs of Children can be emphasized as part of the Section 2511(b) analysis, ***G.M.S.***, 193 A.3d at 401, and Davison's, Burrow's, and Dr. von Korff's testimony demonstrated that Children are not safe with Mother.

Additionally, a trial court must consider the "security" and "stability" the children might have with the foster parents. *Id.* In the instant case, Dr. von Korff testified that Children's relationship with Foster Parents is secure and supportive. N.T. at 63, 70.

The other major aspect of the needs and welfare analysis pursuant to Section 2511(b) is the nature and status of the emotional bond between the parent and the children, including whether the relationship between the parent and the children can be severed without detrimental effects on the children. *See id.* In the instant action, Dr. von Korff, as an expert in clinical psychology, performed a bonding assessment. N.T. at 16-17. According to Dr. von Korff, Mother was unaware of how to sense Children's emotional needs. *Id.* at 40. For example, Mother believed that handing Children teething rings was sufficient to meet their emotional needs. *Id.* at 48. Dr. von Korff opined that severing contact with Mother would not significantly disrupt Children. *Id.* at 70.

Mother herself admitted that there was no bond remaining between herself and Children, testifying: "We had a bond and, obviously, that doesn't exist anymore." *Id.* at 207.

This Court is conscious that Mother's difficulties bonding with Children and recognizing their emotional needs could be a result of her autism. *Id.* at 21-24, 40, 42, 56, 228; CYS Exs. 12 at 2-3, 8-9, 11; CYS Exs. 31 at 8.

Nevertheless, Dr. von Korff "doubt[ed]" that Mother's issues were "attributable to the autistic diagnosis." N.T. at 67.

Moreover, even if we were to disregard all testimony about Mother and Children's emotional connection or lack thereof, including the bonding analysis that Section 2511(b) does not explicitly require, *G.M.S.*, 193 A.3d at 401, we would still find the above-mentioned safety and security concerns overwhelming. Mother's inability to ensure Children's safety establishes that she cannot fulfill the "needs and welfare" of Children under the Section 2511(b) analysis nor otherwise demonstrate that the relationship between herself and Children is "necessary and beneficial" to Children. 23 Pa.C.S. § 2511(b); *G.M.S.*, 193 A.3d at 401 (the court may emphasize child's safety needs); *N.A.M.*, 33 A.3d at 103 ("The mere existence of an emotional bond does not preclude the termination of parental rights."; whether "termination would destroy [a] . . . necessary and beneficial relationship"); *cf. In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (termination affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). "Ultimately, the concern is the needs and welfare of a child[,]" *M.P.*, 204 A.3d at 983 (citation omitted), which for a plethora of reasons irrespective of her autism, Mother has repeatedly shown that she cannot guarantee. "A parent's basic constitutional right to the custody and rearing of her child is converted, upon the failure to fulfill her parental duties, to the child's right to have proper parenting and fulfillment of the child's potential

in a permanent, **healthy, safe environment**." ***Id.*** at *10-*11 (citation and internal brackets and ellipses omitted). Although we are sympathetic to Mother's special needs, Children's own special needs make their safety paramount. ***In re A.D.***, 93 A.3d 888, 898 (Pa. Super. 2014) ("court may equally emphasize the **safety** needs of the child under subsection (b), particularly in cases involving . . . children with special needs" (emphasis in original)).

Based upon our careful review, the competent record evidence demonstrates that involuntarily terminating Mother's parental rights will serve Children's developmental, physical, and emotional needs and welfare. 23 Pa.C.S. § 2511(b).

### *Additional Reasonable Efforts and Training by CYS for Mother*

Finally, we combine Mother's assertions that she could improve if additional training and services were made available to remedy any remaining conditions, because such an argument concerns both subsections 2511(a)(2) and (b). Mother's Brief at 9-10.

Specifically, Mother maintains that Dr. von Korff "stated the type of intensive training by which she may be able to meet [C]hildren's emotional and connective needs." ***Id.*** at 9. Mother argues that "services would be available to remedy any remaining conditions within a reasonable period of time and termination of parental rights would not best serve the needs and welfare of [Children]." ***Id.*** at 10.

Nevertheless, "[n]either subsection (a)[(2)] nor (b) [of § 2511] requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." *In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014); *see also In re C.K.*, 165 A.3d 935, 944 (Pa. Super. 2017) ("parental rights may be terminated even if the agency fails to make reasonable efforts to reunify the family"); *B.L.W.*, 843 A.2d at 384 n.1 ("the adequacy of CYS's efforts towards reunification is not a valid consideration at the termination of parental rights stage, as the law allows CYS to 'give up on the parent'" (citation and internal brackets omitted)).[17]

> Further, while we acknowledge that other states have included reasonable efforts as either an element or merely a factor in their termination provisions, the Pennsylvania legislature has not incorporated reasonable efforts into the language of 23 Pa.C.S. § 2511(a)(2), and it would be improper and, indeed, unwise for this Court to add such an element to the statute by judicial fiat. In contrast, we recognize that the legislature included consideration of the reasonable services available to the parent in regard to another ground for termination, subsection 2511(a)(5) (providing for consideration of whether "the services

---

[17] The Supreme Court of Pennsylvania has held:

> [T]he provision or absence of reasonable efforts **may** be relevant to a court's consideration of both the grounds for termination and the best interests of the child. For example, as applicable to subsection (a)(2), a court **may** find an agency's lack of assistance to a parent relevant to whether a parent's incapacity "cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2).

*D.C.D.*, 105 A.3d at 672 (emphasis added). Nonetheless, consideration of a child welfare agency's reasonable efforts is not **required**. *Id.*

or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time").

***D.C.D.***, 105 A.3d at 672-73.[18]

We cannot make a special exception to this rule that a trial court need not consider the efforts of the agency towards reunification due to Mother's autism or any other special needs. In ***In re J.J.L.***, 150 A.3d 475, 482 (Pa. Super. 2016), this Court concluded that the Americans with Disabilities Act ("ADA") did not apply to a proceeding regarding the termination of an intellectually disabled mother's parental rights under the Adoption Act. This Court asserted: "Addressing such a claim in the context of the ADA would . . . require the trial court to shift its attention from the needs of the Child to those of the Mother." ***Id.***[19] This Court reiterated that reasonable efforts by an agency at reunification are not required for termination of parental rights. ***Id.***

By the time a termination petition has been filed, it is too late for a parent to argue that a child welfare agency failed to make sufficient or

---

[18] Had Mother's parental rights only been terminated pursuant to § 2511(a)(5), Mother may have had a persuasive argument that the reasonable services available to her were inadequate, thereby precluding termination. Nonetheless, as noted above, we only need to agree with the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a), such as (a)(2), in order to affirm. ***B.L.W.***, 843 A.2d at 384.

[19] This Court added that "Mother's claims related to any alleged discrimination are more appropriately handled in a suit separate from the termination of her parental rights[.]" ***J.J.L.***, 150 A.3d at 482.

reasonable efforts to reunite the parent and children. Such an argument should have been made in the dependency court:

> Section 6351 details the required findings and determinations that a Juvenile Court must make in regard to dependent children, . . . Section (f) speaks to the "matters to be determined at [a] permanency hearing," including "[w]hether reasonable efforts were made to finalize the permanency plan in effect." [42 Pa.C.S.] § 6351(f)(5.1).

*D.C.D.*, 105 A.3d at 673; *see also id.* at 677 (Eakin, J., concurring) ("Neither § 2511 of the Adoption Act nor § 6531 of the Juvenile Act preclude a court from ordering the termination of parental rights where a child-welfare agency fails to provide reasonable efforts to promote reunification. Incorporating a reasonable-efforts requirement at the termination-of-parental-rights stage would do nothing more than improperly punish children, as their placement in foster care would be unjustly lengthened solely as a result of an agency's deficiencies." (footnotes omitted)).

As far as we can determine from the certified record in the instant matter, Mother never appealed any of the orders entered from the juvenile court's docket. We thereby cannot now – at the termination stage -- render a decision as to whether CYS's efforts to reunite Mother and Children were reasonable and sufficient.[20]

---

[20] Assuming we could make such a determination about CYS's reasonable efforts, we would be dissatisfied by CYS's failures: (1) to test Mother for autism; (2) to have Mother meet or otherwise interact with Tipton, CYS's intellectual disability supervisor; (3) to provide any services to Mother that
*(Footnote Continued Next Page)*

*     *     *

We are not without a sense of compassion for Mother. **See S.P.**, 47 A.3d at 827. We are aware that Mother has consistently substantially complied with her FSP, has attended all visitation except where Children's health or inclement weather forced a cancellation, completed all ordered classes, has support from her sister and mother, and resolved her employment, housing, and transportation issues. CYS Exs. 3 at 2, 4 at 1-2, 5 at 1-2, 6 at 1-2, 8 at 3; N.T. at 202, 208, 239, 250, 271-74.

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯

were specifically geared towards parents with autism, particularly as Mother was not diagnosed nor tested for autism as a child and has thus lacked the coaching, development, and other education that benefits an autistic individual; and (4) to contact and to coordinate with services in the Erie area, such as Project First Step, if inadequate resources were available in Warren County. N.T. at 61 (services in Erie), 67 (Dr. von Korff suggest that Mother could be "cued" into "some behaviors such as eye contact" and "animated voice"), 200 (Davison conceding that no comparable services existed in Warren County); CYS Exs. 12 at 8, 11 (incomprehension of Mother's autism during her childhood leading to failure to receive professional intervention).

We find CYS's lack of adaption for Mother's autism especially problematic as so much of the evidence for termination focused on Mother's inability to comprehend emotional needs and social cues. CYS Exs. 12 at 2, 9 ("trouble reading social cues" and "body language and facial expressions"); N.T. at 24, 40, 42, 67 (Dr. von Korff spoke of: Mother's inability to sense "emotional needs" as a "function of her autism"; "her status as an autistic individual preclude[ing] her from recognizing social cues"; Mother's "kind of inadequate appreciation of the importance of emotional and physical contact"), 272-73 (trial court focused on Mother's inability to provide Children with appropriate care for "their emotional needs" and "attachment issues"); **see also id.** at 21-22 (Dr. Korff finding Mother "limited . . . by virtue of her . . . autism" and "limited by her autistic frame of reference").

Nonetheless, based on the foregoing, we are constrained to conclude that the trial court did not abuse its discretion, make an error of law, nor rely upon insufficient evidence by terminating Mother's parental rights to Children.  *See B.J.Z.*, 2019 PA Super 106, *9.  "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result."  *Id.* at *10.  Accordingly, we affirm the decrees.

Decrees affirmed.


President Judge Emeritus Bender joins.

Judge Nichols concurs in the result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  6/19/2019