J-S65029-18

2018 PA Super 322

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO T.L.C. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.R.C., JR., FATHER | : | No. 1026 MDA 2018 |

Appeal from the Decree Entered May 23, 2018
In the Court of Common Pleas of Lancaster County
Orphans' Court at No:  2018-00544

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TEMINATION OF PARENTAL RIGHTS TO M.S.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.R.C., JR., FATHER | : | No. 1027 MDA 2018 |

Appeal from the Decree Entered May 23, 2018
In the Court of Common Pleas of Lancaster County
Orphans' Court at No:  2018-00545

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO D.R.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.R.C., JR., FATHER | : | No. 1028 MDA 2018 |

Appeal from the Decree Entered May 23, 2018
In the Court of Common Pleas of Lancaster County
Orphans' Court at No:  546 of 2018


BEFORE:  SHOGAN, J., STABILE, J., AND McLAUGHLIN, J.

OPINION BY STABILE, J.:                    **FILED NOVEMBER 30, 2018**

H.R.C., Jr. ("Father"), appeals from the decree entered May 23, 2018, which terminated involuntarily his parental rights to his minor children, T.L.C., a female born in January 2001, M.S.C., a female born in October 2003, and D.R.C., a male born in January 2006 (collectively, "the Children").[1]  After careful review, we vacate as to M.S.C., affirm as to T.L.C. and D.R.C., and remand for further proceedings consistent with this Opinion.

The record reveals that the Lancaster County Children and Youth Social Service Agency ("the Agency" or "Petitioner") has a lengthy history of involvement with this family dating back to 2001.  Petitioner's Exhibit 2 (Business and Summary Testimony) at 1.  Beginning in July 2014, the Agency received numerous reports alleging severe mental health concerns for T.L.C., including suicidal ideation and an apparent suicide attempt.  *Id.* at 2-3.  According to the reports, Father and Mother were failing to obtain appropriate treatment for T.L.C., and Mother was engaging in drug use.  *Id.*  On July 14, 2016, and July 20, 2016, the Agency received reports alleging domestic violence concerns between Father and Mother.  *Id.* at 3-4.  The Agency received an additional report on July 25, 2016, alleging that Father and Mother had been arrested and released on bail following a domestic violence incident. *Id.* at 4.  The Agency implemented a safety plan, pursuant to which the Children were to have no contact with Father and Mother for a period of no

---

[1] The decree also terminated involuntarily the parental rights of the Children's mother, D.M.C. a/k/a D.M.P. ("Mother").  Mother did not file an appeal.

more than sixty days. *Id.* However, on July 27, 2016, the Agency received a report that the Children's caregiver under the safety plan was refusing to care for T.L.C. due to the child's ongoing marijuana use. *Id.* In addition, the Agency received reports that Father was contacting the Children via text messages in violation of the safety plan and that T.L.C. had returned to Father's home where Mother was also residing. *Id.* The Agency requested and obtained temporary custody of the Children on July 27, 2016. *Id.*; Notes of Testimony ("N.T."), 5/22/18, at 82. The juvenile court adjudicated the Children dependent on September 15, 2016. Petitioner's Exhibit 2 at 4; N.T., 5/22/18, at 82-83. On November 16, 2017, the court changed the Children's permanent placement goals from reunification to placement with a permanent legal custodian.

On March 6, 2018, the Agency filed a petition to terminate Father's parental rights to the Children involuntarily. The orphans' court conducted a termination hearing on May 22, 2018. At the conclusion of the hearing, the court announced its intention to terminate Father's rights. On May 23, 2018, the court entered a decree memorializing its decision. Father timely filed notices of appeal on June 20, 2018, along with concise statements of errors complained of on appeal.

Father now presents the following questions for our review.

> I. Whether the [orphans' c]ourt erred when it terminated Father's rights?

II. Whether the [orphans' c]ourt erred in finding that terminating Father's parental rights would best serve the needs and welfare of the [C]hildren?

Father's Brief at 4.

We review Father's claims mindful of the following standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Before reviewing the merits of Father's appeal, we address *sua sponte* the Children's right to legal counsel. *See In re Adoption of T.M.L.M.*, 184 A.3d 585, 588 (Pa. Super. 2018) (raising *sua sponte* the child's right to legal counsel "as children are unable to raise the issue on their own behalf due to their minority.").

The Children's right to counsel derives from the Adoption Act, which requires that children receive counsel in all contested involuntarily termination proceedings.

**(a) Child.--**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may

- 4 -

appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a).

Our Supreme Court has explained that the term "counsel" in Section 2313(a) refers to an attorney directed by the child who represents his or her legal interests. **In re Adoption of L.B.M.**, 161 A.3d 172, 180 (Pa. 2017). A child's legal interests are distinct from his or her best interests. **Id.** at 174. Specifically, a child's legal interests are synonymous with his or her preferred outcome, while a child's best interests are for the orphans' court to determine. **Id.** The Supreme Court has confirmed that an attorney may represent both a child's best interests as a guardian *ad litem* ("GAL") and that child's legal interests as counsel pursuant to Section 2313(a), but only if no conflict exists between the two interests. **In re T.S.**, 192 A.3d 1080, 1088 (Pa. 2018).

In the instant matter, Robert S. Cronin, Jr., Esquire, represented the Children as both their GAL and legal counsel during the termination hearing. The orphans' court did not appoint separate legal counsel for any of the Children. Accordingly, it was permissible for Attorney Cronin to represent the Children only so long as their best interests did not conflict with their preferred outcomes.

At the start of the termination hearing, the trial court interviewed all three Children. Both T.L.C. and D.R.C. stated that they wanted their foster

- 5 -

parents to adopt them and that they supported the termination of Father's parental rights. N.T., 5/22/18, at 27-28, 33, 40-41, 46-47. However, M.S.C. expressed a contrary opinion. While M.S.C. confirmed that she wanted to continue living in her foster home, she did not want the court to terminate Father's rights. She stated as follows.

> THE COURT: . . . . How are things going with your resource parents?
>
> [M.S.C.]: It's a little bit shaky sometimes, but getting better.
>
> THE COURT: Do you want to continue to live there?
>
> [M.S.C.]: Yeah.
>
> ***
>
> THE COURT: What do you think about this issue of terminating the rights of your parents?
>
> [M.S.C.]: I mean, like, [I'm] not really, like, happy about it. Like, my dad was, like, the only one I could really talk to about things because he really understood me more than anybody else. So, like, I would like them not to be, but I know that they're going to be, so it's kind of just something that I have to deal with so --
>
> THE COURT: Well, why do you think they're going to be?
>
> [M.S.C.]: Everybody is saying it is and just --
>
> THE COURT: Who is telling you that?
>
> [M.S.C.]: Foster parents. It just kind of seems like that's where things are going.
>
> ***
>
> [By Father's counsel:]

Q      [M.S.C.], I represent your dad.  You said that you are not happy about the termination proceeding; is that right?

A      Yes.

Q      And why aren't you happy about it?

A      Because I feel like my dad was the only one who got me, and he's not giving -- given a lot of credit for the things that he's done for me, because the kids who -- my older siblings, they weren't usually home, and I was always alone at home, and my dad was the only one there for me through that whole time through my depression.  I would have definitely committed suicide if it wasn't for my dad.  So that's a big part of my life.  My dad has always been a big part of my life, and that's just something I don't want to lose.

Q      Have -- have you had any discussions with [the Agency caseworker] or the foster family about not wanting to be adopted?

A      Yes.  I've expressed -- I'm sorry -- expressed my concerns of that, but nothing has, like, been said otherwise.

Q      Do you feel that you've -- that you have the right to say that you don't want to be adopted?

A      Oh, yes.

Q      And you haven't said that so far?

A      I told [Attorney Cronin] that I, you know, wasn't really interested right now, but as we go on, I think I would be eventually, I'm just not ready yet because everything is going so fast.

Q      Do you think that your sisters[2] and your brother influence your thinking about this?

A      I think they definitely play a big part in that because I don't want to be split from them, because they're the only things that I've had other than my dad.  So I kind of have nowhere else to

_____

[2] The Children have other siblings who are not the subject of this appeal.

- 7 -

go. So this is kind of where I have to be, and if they were getting adopted, I know that, like it would be okay -- it would be okay for me to just be fostered by them. Like, I know they would be okay with it. So it's not too much of a worry for me.

Q So you would be okay with staying with your foster parents and not being adopted by them even if your siblings were adopted by them?

A Yes.

***

Q If you had a choice of going back and living with -- with your father, is that something you would like to do?

A Yes.

***

[By counsel for the Agency:]

Q So -- and correct me if I'm wrong, but what I'm hearing is that you want to remain in the resource home because your siblings are there, and for right now you, too, think that it's a good place to be, and you're not opposed to sometime in the future being adopted, but right now, you're not at a place where you want to be adopted within the next couple of weeks?

A Yes. I think that I would be, as I think I just need to solve things with the foster family first before I make any decisions, because I don't want to be in a place where I feel like I can't leave if I feel like I'm not right to be there. So I just want to make sure that I'm doing the right thing.

*Id.* at 59-60, 65-67, 79.

After the orphans' court met with the Children, it conferred with Attorney Cronin. The following exchange took place concerning the possible existence of a conflict between the Children's best interests and legal interests.

THE COURT: Mr. Cronin, is there a conflict between your representation of the [C]hildren, as well as being guardian ad litem for the [C]hildren?

MR. CRONIN: Your Honor, I don't believe there is.

THE COURT: All right. . . .

*Id.* at 122.

At the conclusion of the hearing, Attorney Cronin presented the following statement on the Children's behalf.

MR. CRONIN: Your Honor, I would agree with the majority of the Agency solicitor's comments.

With respect to [M.S.C.]; however, I would indicate that it's my understanding that she was pretty clear that she did not feel ready to make the determination about whether she would want to pursue an adoption at this point in time. But I do believe that she had indicated a willingness and recognized the need to continue to work with the current resource family, which she recognized as a safe setting for her that provided her with the stability to be able to work on those types of issues, to have some sort of normal childhood.

But I would agree and support the Agency's petition for termination of parental rights as to all three, to provide these children with permanency as they move forward.

*Id.* at 171-72.

Following Attorney Cronin's statement, the orphans' court explained its decision to terminate parental rights. It addressed M.S.C.'s legal interests as follows.

We heard from one child who is, to me ambivalent about termination. She seemed resigned to the fact that it would happen because of the history of the Agency and the [c]ourt with these parents. She's having some difficulty with the resource parents, but everything seems to be going well. She's optimistic

- 9 -

it will get better in the future as they work out some issues that they have. We know she's involved with -- at least with some charity event and seems to enjoy that.

*Id.* at 175.

As the above quotations demonstrate, Attorney Cronin advocated in favor of the Children's best interests, as well as the legal interests of T.L.C. and D.R.C. However, he advocated in a manner directly contrary to M.S.C.'s legal interests. While the trial court found that M.S.C. was merely ambivalent about the termination of Father's parental rights, the record refutes this conclusion. M.S.C. was clear during her interview that she did not support termination and it was an abuse of the court's discretion to find otherwise. Thus, because a conflict existed between M.S.C.'s best interests and legal interests, it was not permissible for Attorney Cronin to act as both her GAL and legal counsel. We must therefore vacate the portion of the decree terminating Father's parental rights as to M.S.C. and remand for a new termination hearing during which she must have the benefit of legal counsel directed by her and advocating in support of her preferred outcome.

We next turn our attention to the portions of the decree terminating Father's parental rights as to T.L.C. and D.R.C. Because no conflict existed between those children's best interests and legal interests, we proceed to address the issue on the merits.

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence

that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the orphans' court terminated Father's parental rights to T.L.C. and D.R.C. pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need agree with the court as to only one subsection of Section 2511(a) as well as Section 2511(b) in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). In this case, we analyze the court's decision pursuant to Section 2511(a)(2) and (b), which provide as follows.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

- 11 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its opinion, the orphans' court found that Father failed to comply with the objectives set forth in his child permanency plan ("CPP"). Orphans' Court Opinion, 7/30/18, at 5 (unnumbered pages). The court explained that Father

failed to complete mental health, drug and alcohol, and domestic violence evaluations, as well as a parenting program. *Id.* at 5-6. Father tested positive on drug screens, incurred criminal charges, failed to maintain stable housing and income, and failed to visit the Children consistently. *Id.*

Father concedes that he did not complete the objectives of his CPP but argues that he made progress toward completing those objectives and that the orphans' court should have afforded him more time. Father's Brief at 6. Father asserts that he obtained a mental health evaluation, acquired stable housing, received income in the form of Social Security disability benefits, maintained contact with T.L.C. and D.R.C., and was in the process of obtaining a domestic violence evaluation, parenting classes, and drug and alcohol evaluation. *Id.* at 6, 9-12. He blames his delay in completing the objectives on several factors, including a lack of funds, a lack of transportation, not being familiar with community resources, a family medical emergency, and being "incarcerated for something he did not do[.]" *Id.* at 9-11. He also suggests that he did not send letters to T.L.C. and D.R.C. because "he was concerned about the caseworker reading the letters and privacy issues." *Id.* at 13.

The record supports the findings of the orphans' court. Father's CPP objectives included improving his mental health functioning, remaining free from drug and alcohol abuse, remaining crime free, remaining free of domestic violence, learning and using good parenting skills, being financially stable, maintaining a safe home, maintaining an ongoing commitment to the

Children, improving family relationships, and developing an understanding of sexual victimization.[3]  Petitioner's Exhibit 2 at 6-9.

The record reveals that Father failed to address his mental health needs. Father failed to attend three scheduled appointments for a biopsychosocial evaluation, on April 7, 2017, May 9, 2017, and June 13, 2017.  *Id.* at 6.  The Agency then referred Father for a psychological evaluation and he failed to attend two more appointments on August 31, 2017, and September 6, 2017. *Id.* at 7.  During the termination hearing, Agency caseworker, Caitlin Hoover, testified that Father still had not obtained an evaluation.  N.T., 5/22/18, at 93.  Father left her a message only a few days prior to the hearing stating that he intended to obtain an evaluation.[4]  *Id.*

With respect to drugs and alcohol, Father tested positive for cocaine and amphetamines in October 2016.  Petitioner's Exhibit 2 at 7.  Father then failed to attend appointments for a drug and alcohol evaluation on July 14, 2017, and July 18, 2017.  *Id.*  Father informed the Agency in April 2018 that he had another evaluation appointment.  *Id.*  However, to the Agency's knowledge, he did not attend that appointment either.  *Id.*  Ms. Hoover believed that Father missed at least five appointments in total.  N.T., 5/22/18, at 94.

_____

[3] Early in the Agency's involvement with the family, it discovered that T.L.C. and M.S.C. had been the victims of sexual abuse by a perpetrator other than Father.  Petitioner's Exhibit 2 at 1.

[4] Father testified that he completed the evaluation on May 21, 2018, only one day before the hearing.  N.T., 5/22/18, at 131.

- 14 -

As for Father's CPP objective requiring him to remain crime free, Father was cited for driving without a license in November 2016. Petitioner's Exhibit 2 at 7. Father failed to pay the associated fine, resulting in the issuance of a bench warrant in June 2017. *Id.* Father was cited for driving an uninspected vehicle that same month. *Id.* Meanwhile, Father was arrested in May 2017 and charged with a variety of crimes related to an alleged incident of domestic violence involving Mother. *Id.* Father remained incarcerated[5] until June 2017 and pled guilty to harassment in July 2017. *Id.* at 7-8. In February 2018, Father incurred additional citations for driving without a license and driving an unregistered and uninspected vehicle. *Id.* at 8. Ms. Hoover reported that, to her knowledge, the citations remained unresolved. N.T., 5/22/18, at 95.

Relatedly, Father failed to complete his domestic violence objective. Aside from engaging in the alleged act of domestic violence mentioned above, Father failed to attend several domestic violence evaluation appointments. Petitioner's Exhibit 2 at 8. Father failed to attend appointments on June 8, 2017, July 20, 2017, August 17, 2017, and September 14, 2017. *Id.* Ms. Hoover reported that she did not receive documentation from Father indicating that he pursued an evaluation after that time. N.T., 5/22/18, at 96.

Father also did not complete his parenting objective, because he did not receive the positive recommendations from service providers necessary for the Agency to make a parenting program referral. Petitioner's Exhibit 2 at 8.

---

[5] Father testified that he was also incarcerated in April 2017 for unspecified reasons. N.T., 5/22/18, at 96.

Similarly, Father did not make sufficient progress on his other objectives for the Agency to refer him to family therapy or to the non-offending parent group in satisfaction of his objectives of improving family relationships and understanding sexual victimization. *Id.* at 9; N.T., 5/22/18, at 101, 113.

With respect to Father's financial stability objective, he did not provide the Agency with any proof of income documentation. Petitioner's Exhibit 2 at 8. Father claimed he was working for a temporary employment agency in September 2017. *Id.* By April 2018, he reported he was not working due to a disability. *Id.* As for Father's housing, he failed to provide the Agency with a lease or other documentation showing rent or utility payments. *Id.* Father reported moving to a new residence in September 2017. *Id.* In April 2018, he informed the Agency that he was living with his mother. *Id.* During the termination hearing, Father testified that he had lived with his mother since March 2017, but that he would be moving to a new residence in June 2018. N.T., 5/22/18, at 124-25, 147-48.

Finally, Father failed to complete the objective requiring him to maintain an ongoing commitment to the Children. Ms. Hoover testified that Father attended only two visits with the Children before the visits were suspended. N.T., 5/22/18, at 97. The record does not indicate how many visits Father had the opportunity to attend or whether he attended those visits

inconsistently.[6]  However, in February 2017, the juvenile court ordered that Father would need to confirm his attendance at visits twenty-four hours in advance.  Petitioner's Exhibit 2 at 9.  The court further directed that Father would need to arrive for visits early and test negative for illegal substances.  *Id.*  The court cautioned Father that it would suspend his visits if he failed to attend the next visit for any reason.  *Id.*  Father failed to attend a visit several days later and the court suspended his visits pending completion of the biopsychosocial evaluation mentioned previously.  *Id.*  Father continued to have phone contact with the Children until a phone call in June 2017, during which he stated that he had only ten months to live due to a cancer diagnosis.[7]  *Id.*  After that call, the Agency prohibited all phone contact outside of a therapeutic setting.  *Id.*  Despite this prohibition, Father attempted to contact the Children using their cell phones and social media.  *Id.*

Thus, the record confirms that Father is incapable of parenting T.L.C. and D.R.C., and that he cannot or will not remedy his parental incapacity. Father demonstrated little if any interest in achieving reunification in this case. Father failed to complete the objectives outlined in his CPP.  He missed numerous appointments for his mental health, drug and alcohol, and domestic violence evaluations.  He also demonstrated severe instability in terms of his

---

[6] In its brief, the Agency indicates it asked the juvenile court to suspend Father's visits on the basis he posed a grave threat of harm to the Children. Agency's Brief at 6.

[7] There is no indication in the record that Father has passed away.

housing, income, and ongoing legal trouble. As a result, Father remains in no position to provide T.L.C. and D.R.C. a safe and stable environment and appears no closer to doing so than he did at the start of their dependency. Father complained during the hearing that he was unable to comply with his CPP objectives due to a lack of funds, transportation problems, and multiple wrongful incarcerations. N.T., 5/22/18, at 130-37. He also claimed that he was now in a position to comply with his objectives because he signed up for a program that would pay for the necessary evaluations and parenting classes. *Id.* at 141-42. The orphans' court was free to reject Father's testimony as disingenuous. *See In the Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017), *appeal denied*, 170 A.3d 991 (Pa. 2017) ("The Orphans' Court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."); *A.L.D.*, 797 A.2d at 340 ("[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous."). Accordingly, we discern no abuse of discretion.

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights to T.L.C. and D.R.C. involuntarily pursuant to Section 2511(b). The requisite analysis is as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law,

however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted)).

The orphans' court found that the needs and welfare of T.L.C. and D.R.C. would be best served by remaining in foster care and being adopted by their foster parents. Orphans' Court Opinion, 7/30/18, at 6 (unnumbered pages). The court reasoned that T.L.C. and D.R.C. had spent twenty-two months in foster care and that Father would not resolve his parental incapacity within a reasonable time. *Id.* It observed that T.L.C. and D.R.C. are in a loving and healthy pre-adoptive home and realize that Father did not parent them appropriately. *Id.*

With respect to Section 2511(b), Father focuses his argument almost entirely on M.S.C. Father's Brief at 13-14. He also argues that it was contrary to the needs and welfare of the Children collectively to terminate his parental

rights because he was working toward completion of his CPP objectives. *Id.* at 14.

The record confirms that terminating Father's parental rights would best serve the needs and welfare of T.L.C. and D.R.C. It is apparent, as discussed above, that Father is nowhere near being able to provide appropriate parental care. Moreover, T.L.C. and D.R.C. do not have a bond with Father such that termination would cause them to suffer irreparable harm. Both children stated to the orphans' court that they wanted their foster parents to adopt them and that they supported the termination of Father's parental rights. N.T., 5/22/18, at 27-28, 33, 40-41, 46-47. D.R.C. explained that Father and Mother are "just not good parent[al] figures. They -- they just didn't put us first. They put other drugs first and [it was] just not a healthy environment." *Id.* at 28. D.R.C. further stated that Father "didn't treat us like we were his kids" and that he would not want to have any further contact with Father. *Id.* at 31-32. T.L.C. explained that she wanted to speak with Father, but only so that he could admit his failings and apologize "for what he has done." *Id.* at 43-44. When asked why she wanted her foster parents to adopt her before she turns eighteen in January 2019, T.L.C. stated as follows.

> For the past 17 years of my life, I feel like I've just been living with -- dealing with people that I don't really know. You know, I -- I look at my biological parents, and I'm not angry anymore. I'm not sad. I'm not upset, but I just -- they're just strangers to me. There's no emotional connection. There's nothing. But with my foster family now, I -- I feel like I just -- I finally have, you know, some chance [of] having a real family.

- 20 -

*Id.* at 46-47.  In light of this evidence, we discern no abuse of discretion by the orphans' court in terminating Father's rights pursuant Section 2511(b).

Based on the foregoing, we vacate the portion of the decree terminating Father's parental rights as to M.S.C. and remand for a new termination hearing to occur as soon as possible, during which M.S.C. must have legal counsel directed by her who advocates in support of her preferred outcome.  Attorney Cronin may continue to serve as M.S.C.'s GAL, but he may not serve as legal counsel.  In addition, we affirm the portions of the decree terminating Father's parental rights to T.L.C. and D.R.C., as we conclude that the orphans' court did not abuse its discretion in that regard.

Decree vacated in part and affirmed in part.  Case remanded for further proceedings consistent with this Opinion.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/30/2018

- 21 -