J-S34044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: D.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.F. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 372 WDA 2019 |

Appeal from the Order Dated January 15, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  CP-02-AP-0000087-2018

BEFORE:   DUBOW, J., McLAUGHLIN, J., and COLINS*, J.

MEMORANDUM BY COLINS, J.:                    **FILED JULY 23, 2019**

Appellant, D.F. ("Mother"), appeals from the order entered January 15, 2019, that involuntarily terminated her parental rights to her son, D.F., born June 2015 ("Child"), pursuant to the Adoption Act.[1]  We affirm.

The trial court summarized the factual and procedural history of this matter as follows:

> In October 2016, the Allegheny County Office of Children, Youth, and Families ("CYF") received reports that Mother was homeless, and that Child lacked adequate medical care.  In addition, on May 19, 2016, Mother pled guilty to one count of possession of heroin, for which she received a sentence of probation.  In September, 2016, Mother pled guilty to possession of a controlled substance and receipt of stolen property, resulting in a revocation of her probation.  Mother was subsequently resentenced to twelve months of probation.
>
> On December 9, 2016, CYF sought emergency protective custody

---

[1] 23 Pa.C.S. §§ 2101-2938.

---

\*   Retired Senior Judge assigned to the Superior Court.

of Child on grounds that Mother had a history of drug and alcohol abuse and homelessness, and after receiving reports that Mother had become involved in an altercation when Child was present.  In addition CYF expressed concern that Child's babysitter was not appropriate, and that Child was not receiving adequate medical care.  This Court granted the order for emergency protective custody, and CYF removed Child from Mother's care.  On December 12, 2016, this Court entered a shelter care order, and subsequently adjudicated Child dependent on February 8, 2017 after Mother stipulated to an inability to care for the child because of her drug and alcohol use and her incarceration.

Following Child's removal from Mother's home, Child was placed in foster care.  On April 11, 2018, CYF filed a petition for termination of parental rights [pursuant to Section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).]

Trial Court Opinion at 2-3 (citation omitted).

A hearing was held on the termination petition on January 11, 2019.[2] As of the date of the termination hearing, Child had been in the care of his foster parents for over 25 months.  *Id.* at 3.  At the hearing, a legal representative was present to represent Child's legal interests and best interests.  *See In re T.S.*, 192 A.3d 1080, 1089-93 (Pa. 2018) (stating that in situations where a child is non-verbal or is too young to communicate his or her preference, an attorney-guardian *ad litem* may serve a dual role and represent a child's non-conflicting best interests and legal interests).  Mother was present at the hearing and represented by counsel.

---

[2] The termination petition also sought the termination of the parental rights of Child's father.  While Mother provided CYF with two names for the father of the Child, she was unable to provide any other identifying information, and CYF was never able to locate the two men or otherwise determine the identity of the two men.  N.T., 1/11/19, at 4-5.  The trial court involuntarily terminated the parental rights of Child's unknown father in its January 15, 2019 order.

A CYF caseworker, Glenice Anderson, testified that after Child was removed from Mother's care and placed in foster care, CYF established a family service plan for Mother with three goals. N.T., 1/11/19, at 6-7. The first goal was for Mother to participate in a drug and alcohol evaluation, follow the recommendations of the evaluation, comply with random urine drug screens, and sign all required releases of information. *Id.* The second goal required Mother to participate in a mental health evaluation, follow the recommendations of the evaluation, and sign all required releases of information. *Id.* at 7. The third goal in the CYF plan called for Mother to cooperate with CYF and all service providers, comply with a visitation schedule, obtain and maintain adequate housing, comply with the conditions of her probation, and obtain gainful employment. *Id.*

The CYF caseworker testified that CYF required a drug evaluation as part of the first goal of the family service plan based on Mother's self-reported use of marijuana and previous positive tests for marijuana and on the odor of marijuana in her home. *Id.* at 9, 36-38. The caseworker stated that, to her knowledge, Mother had not completed the required drug and alcohol evaluation with POWER, a drug and alcohol treatment provider, and had not signed a release to allow CYF to determine Mother's compliance. *Id.* at 7-8, 19. The caseworker testified that Mother had attended only 4 out of 54 urine screens to which she had been called, and at least 2 of those tests were positive for high levels of THC. *Id.* at 9, 19, 33-35, 53-54, 60-61. Mother had also represented to CYF that she was tested by a prior employer, but CYF

was never able to verify the screens with the employer, some of the dates she claimed to have been tested by her employer coincided with dates she was incarcerated, and information provided from the prior employer indicated that the documented results of the employer-screens were not authentic. *Id.* at 54-55, 65-66, 69-73. The CYF caseworker therefore did not believe that Mother has complied with the first goal. *Id.* at 18-20.

Regarding the second goal, the caseworker testified that mental health evaluation and treatment was added to Mother's plan as a result of her June 13, 2017 diagnosis of adjustment disorder with depressive mood. *Id.* at 23. Mother did receive a mental health evaluation as required, she began to engage in treatment with Mercy Behavioral Health ("Mercy"), and she signed an updated release as recently as November 2018. *Id.* at 9-10. However, Mother only completed three of six scheduled appointments at Mercy and her last attended appointment was on January 29, 2018. *Id.* at 10, 18. In addition, Mother had also met on one occasion in a one-on-one visit with a therapist shortly before the termination hearing, but CYF was not able to obtain details on that treatment because Mother had not provided a release for that provider. *Id.* at 32-33, 59-60.

With respect to CYF's third goal for Mother, the caseworker stated that Mother had not been cooperative with each of the service providers CYF connected her to, including POWER and Every Child, an in-house parenting service that closed out their service with Mother based on her failure to communicate with them. *Id.* at 10-11, 55. CYF did determine that Mother

had obtained suitable housing, although her home continued to smell of marijuana during home visits. *Id.* at 11-12. CYF determined that Mother had also been compliant in her employment goal, obtaining gainful employment on October 31, 2018. *Id.* at 13-14, 38-39. Prior to that date, Mother had reported gainful employment at two other jobs, but one of the prior employers had denied that Mother ever worked there. *Id.* at 39-40, 72. Additionally, Mother had not provided sufficient documentation as to the other employer for CYF to verify that she was employed. *Id.* at 39-40.

The caseworker testified that Mother had not been compliant with the terms of her probation as she continued to engage in criminal conduct. *Id.* at 12-13, 42. In addition to the offenses known to the trial court at the time Child was adjudicated dependent, the caseworker cited Mother's guilty plea on March 21, 2017 to one count of simple assault based on an incident where she knocked on the door of her previous paramour's house and sprayed pepper spray in the paramour's face when the door opened. *Id.* at 13. Mother received six months of probation for this offense. *Id.*

The caseworker stated that Mother had not complied with the family service plan goal for visitation with Child. *Id.* at 17. Based upon her failure to show up at visits, Mother would be asked to confirm her visits 24 hours in advance of the time for visitation. *Id.* at 15-16. Mother's visits were also reduced from twice weekly to once per week. *Id.* at 15. When Mother continued to not show up for the visits, CYF requested that she arrive one hour prior to the visit. *Id.* at 16. In addition, based upon Mother's inability

to obtain transportation to the visits, CYF provided her with bus tickets in advance that were delivered to her by certified mail. *Id.* at 16. Nevertheless, despite the accommodations and efforts of CYF to facilitate Mother's attendance at the visits, Mother appeared at only 33 of the 95 total scheduled visits. *Id.* at 17. In addition, Mother failed to appear entirely and was completely out of communication for a four-month period between July and October 2017. *Id.* at 17-18, 47-48. The caseworker also stated that, to the best of her knowledge, Mother had not attended any of Child's twice-weekly speech therapy appointments or other scheduled medical appointments though the caseworker and Child's foster parents regularly informed Mother of the dates and times of these appointments. *Id.* at 20, 40-42, 57-59, 144-48.

Dr. Beth Bliss, a licensed psychologist who evaluated the relationship between Mother and Child on three occasions, testified that Child appeared to be bonded and attached to Mother and the foster parents and he seemed to view all three as a psychological parent. *Id.* at 76-78, 81-82. Dr. Bliss stated that Mother's interactions with Child were "all natural and appropriate and positive" and Mother attended to his needs and safety concerns. *Id.* at 78. Mother was "initially lower energy" in playing with Child, but her energy level improved and she promoted developmentally appropriate skills, showed physical affection towards Child and engaged in "imaginative play" with him. *Id.* Dr. Bliss testified that Child often smiled and laughed with Mother, seemed comfortable with physical affection from her, and he appeared excited to see

her and did not appear to want to leave her at the end of the visits. *Id.* Regarding the foster parents, Dr. Bliss testified that they had "a natural and playful interaction" with Child, employed developmentally appropriate skills with him, attended to his needs, and fostered his verbal development. *Id.* at 77. Dr. Bliss also noted that the foster parents demonstrated patience with Child during his age-appropriate tantrums, but also set limits with him. *Id.*

In her interviews with Mother, Dr. Bliss found Mother to be polite, personal, and cooperative, but also somewhat guarded and inconsistent in the answers she gave during the separate sessions. *Id.* at 79-80. Mother reported to Dr. Bliss frustration with CYF because she had met her goals of obtaining employment and housing and had maintained regular visits with Child. *Id.* at 81. Mother also admitted to Dr. Bliss that she had not attended some drug screens, but Mother also stated that she had not been called for the tests recently. *Id.* at 81, 89-90. Dr. Bliss stated that, to her, the primary concerns she had regarding a potential reunification of Mother and Child were Mother's criminal activity, substance abuse issues, and her overall veracity. *Id.* at 95-96. Dr. Bliss stated that mental health treatment was highly recommended based upon Mother's reported depressive symptoms and anxiety, but mental health treatment was not necessary for any potential reunification. *Id.* at 91, 95.

Dr. Bliss's opinion was that a subsidized permanent legal custodianship (SPLC) for Child with the foster parents was in Child's best interest. *Id.* at 82, 106-09. When informed that evidence had been presented that Mother

- 7 -

had only attended 4 out of 54 drug screens, tested positive for THC on two occasions, had missed approximately two-thirds of scheduled visits with Child, had not attended Child's speech therapy and other medical appointments, and had not attended mental health treatments as required by the family plan, Dr. Bliss found these facts "concerning" and made her question the veracity of everything Mother told her. *Id.* at 82-84, 104-05. Nevertheless, Dr. Bliss stated that even if Mother had not been telling the truth she would still recommend an SPLC placement rather than termination based on the bond Child had with Mother and the foster parents. *Id.* at 82, 96-98.

Finally, Mother testified at the termination hearing that she had been living for the past five months in an apartment. *Id.* at 112-13, 132-33. Mother's current employment was as a 24-hour aide for her grandmother, who lived in the apartment with her. *Id.* at 112, 121-22. Mother stated that the odor of marijuana that her caseworkers had detected upon visiting her at home were the result of marijuana use by other tenants on her floor and above and below her. *Id.* at 119-20, 132-33.

Mother admitted at the hearing that she previously tested positive for marijuana and she has not been attending drug screens offered by CYF, but she maintained that the drug screen documentation she provided from her prior employer was accurate. *Id.* at 116-19. Mother denied failing to complete her POWER drug and alcohol evaluation, stating that the POWER evaluator came to her house and told her that she did not need treatment through that provider. *Id.* at 117-18. Mother stated that she began one-on-

one, twice weekly substance abuse and mental health treatment on December 27, 2018 with a provider called 412 Zone. *Id.* at 114-15, 118-19, 141-42. Mother explained that she was not able to obtain mental health treatment at Mercy because she was put on a waitlist there. *Id.* at 113-14, 143.

Mother stated that she was able to care for Child if he were returned to her care, and, in the event the trial court determined that Child should remain in foster care, she would comply with all court ordered requirements and maintain regular visitation. *Id.* at 121-28. When asked why she was absent from Child's life for a four-month period between July and October 2017, Mother testified that she did not "even know what happened" and that she has "no reason" for not appearing at the visits. *Id.* at 140. Mother admitted that she had been made aware of the dates and times of Child's medical visits and that she could attend these visits, but she had not been made aware of Child's speech therapy appointments nor was she aware that she could attend these appointments. *Id.* at 123-25, 129-31. Mother stated that she remains on probation, but she is compliant with the conditions of probation. *Id.* at 127-28.

On January 15, 2019, the trial court entered an order involuntarily terminating Mother's parental rights to Child pursuant to Section 2511(a)(1), (2), (5), (8) and (b). On February 8, 2019, Mother filed this timely direct

appeal, along with a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i).[3]

Mother presents the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(b)?

3. Did the trial court abuse its discretion and/or err as a matter of law by allowing counsel appointed to represent the child's legal interest to substitute her judgment which was contrary to the evidence and testimony presented at trial thus depriving the child of his statutory right to effective representation by counsel[?]

Mother's Brief at 6 (trial court disposition omitted).

Mother's first two issues on appeal concern whether the trial court properly terminated her parental rights to Child under Section 2511 of the Adoption Act.

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must

_____

[3] The trial court entered its opinion on April 2, 2019. *See* Pa.R.A.P. 1925(a)(2)(ii).

- 10 -

employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

. . .

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result.

*In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (internal citations and quotation marks omitted).

The trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), and (8) and (b) of the Adoption Act. Section 2511 requires a bifurcated analysis as follows:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citation omitted). We may affirm if we agree with the trial court's decision as to any one subsection of Section 2511(a) and its decision as to Section 2511(b). *Id.* at 922.

- 11 -

In the current case, we affirm the trial court's decision to terminate Mother's parental rights to the Child under subsections 2511(a)(2) and (b), which provide:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the right of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.
>
> The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.

*In re T.L.C.*, 199 A.3d 1270, 1278 (Pa. Super. 2018) (internal citations and quotation marks omitted).

The trial court determined that there existed clear and convincing evidence that Mother was unable to or refused to provide for the essential care and physical needs of Child and she had not taken steps or shown a willingness to remedy these issues over the nearly two-year period since Child had been adjudicated dependent. Trial Court Opinion at 7-16. Initially, as to the issue that led to Child's removal, Mother's criminal history and incarceration, the trial court concluded that Mother had failed to remedy this issue as her additional criminal conviction for assault "indicat[ed] a disinclination or inability on Mother's behalf to consider the needs of Child above her own and a lack of a commitment to ensuring that Child will not be affected by her criminal conduct." *Id.* at 10, 13-14.

The trial court noted that Mother had failed to resolve her admitted substance abuse problem by refusing to attend a drug and alcohol evaluation, participating in only 4 of 54 drug screens that she was called for, and testing positive for THC in at least one of drug screens she did submit. *Id.* at 7-8. Moreover, the trial court observed that CYF had presented credible evidence that Mother had admitted to receiving notice of the drug screens and that she provided false documents that she had passed drug tests administered from a former employer. *Id.* at 8, 12-13. As the trial court stated, Mother's inability to resolve her substance abuse issue "demonstrat[ed] a failure to

show commitment to a drug-free lifestyle and to focus on the needs of [Child] above her own." *Id.* at 8.

The trial court further concluded that Mother had failed to comply with the family service plan goals that were set out in order to demonstrate that she would be willing to meet her parenting obligations and provide Child with a safe and secure environment. Chief among these lapses by Mother was her failure to attend the court-ordered visitation with Child, missing approximately two-thirds of these visits even though evidence showed that Child found the visits meaningful and important. *Id.* at 10. The trial court emphasized that Mother's unexplained four-month gap in visitation from July to October 2017 "demonstrate[d] insensitivity to Child and further indicates her unwillingness or inability to make Child a priority and to give precedence to his needs." *Id.* at 10-11. The trial court added that Mother's failure to meet the requirements to complete a court-ordered parenting training course showed her "unwillingness or inability to meet her parenting obligations and to provide [Child] with a stable, healthy, and secure environment." *Id.* at 9-10, 14.

Upon careful review of the record, we conclude that there was competent evidence before the trial court to show, under the heightened standard of proof applicable in termination of parental rights cases, that Mother demonstrated a neglect or incapacity to meet the essential care and support for Child and that she was unable to remedy these issues despite being given ample time and guidance by CYF. As the trial court stated, Mother was convicted of an additional criminal offense and she failed to address her

admitted substance abuse problem at the root of her criminal problems.[4] Furthermore, despite being provided with the resources and time to do so, Mother was unable to comply with goals established by CYF that were designed to allow Mother to demonstrate her ability to care for Child, including numerous absences from the visitation program that was set up by CYF. Therefore, the trial court did not abuse its discretion in making the determination that CYF had satisfied the standard for termination under Section 2511(a)(2).

Mother argues that the sole reason that caused CYF to remove Child from Mother's care was the fact that Mother was incarcerated and that Mother was unable to care for Child during periods of incarceration, but that this "issue has been resolved." Mother's Brief at 19. Mother argues that her use of marijuana and her failure to comply with parenting goals established by CYF were therefore irrelevant to the trial court's analysis as to whether grounds for termination exists. Mother's argument appears to relate to termination under Section 2511(a)(5) and (8), which require a finding that "the conditions which led to the removal or placement of the child continue to exist" for a period of 6 or 12 months. 23 Pa.C.S. § 2511(a)(5), (8). In this case, however,

_____

[4] We recognize that while the date of Mother's guilty plea was stated at the termination hearing, the date of the offense does not appear in the appellate record and therefore we cannot verify that it occurred after Child's removal from Mother's care. We note, however, that the testimony regarding this conviction and Mother's criminal record were admitted without objection, and Mother has made no argument that this criminal offense predated Child's removal or the family service plan set forth by CYF.

we have analyzed the trial court's findings under Section 2511(a)(2), which requires a determination only that the parent evinced repeated and continued incapacity or refusal to provide for the "essential parental care, control or subsistence" necessary for the well-being of the child. 23 Pa.C.S. § 2511(a)(2). Therefore, the issue of whether Mother had resolved the initial reasons for removal is not essential to our present analysis.

In any event, we disagree with the assertion that Mother has resolved the issue related to her criminal conduct. As discussed above, Mother was convicted of an additional criminal offense during the dependency period, which could have led to the imposition of a term of incarceration. That it did not was good fortune for Mother, but this fact does not evidence that she complied with the conditions of her probation or her family service plan goal. Furthermore, the record shows that Mother was convicted twice for offenses involving the possession of controlled substances within the seven months prior to Child's removal, and Mother admitted to CYF that she had a problem with her use of marijuana. Therefore, Mother's substance abuse issues were directly related to Mother's inability to care for Child that led to his removal. *Cf. In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) (*en banc*) (where child is removed for mother's incarceration on drug offenses, the "drug issues" form a part of the original reasons for the removal of the child). Mother's failure – compounded by her unwillingness to even attempt to try – to resolve her substance abuse is beyond peradventure based on the facts before the trial court.

Mother further argues that the trial court did not properly take into account that she accomplished various of her family service plan goals, including those related to housing, employment, and mental health treatment.[5]  In making the determination that CYF had proven that termination was appropriate under Section 2511(a)(2), the trial court recognized Mother's compliance with some of the family service plan goals established by CYF, including her attainment of suitable housing and stable employment and her participation (albeit belatedly, just prior to the termination hearing) in mental health counseling.  Trial Court Opinion at 8-9.  However, the fact that Mother has made progress towards some of her family service plan goals does not change that she had demonstrated a near total unwillingness or inability to comply with other goals set out for her.  To the extent that Mother now contends that the trial court improperly weighed Mother's compliance with part of the family service plan with her lack of compliance with other parts of the plan, we reject this argument as an improper challenge to the trial court's exclusive authority to resolve conflicts in the evidence.  **B.J.Z.**, 207 A.3d at 921.

_____

[5] Mother argues that the trial court erred in finding that that Mother did not comply with her mental health goal because Dr. Bliss testified that Mother had no mental health concerns that prevented her from parenting Child.  We note that, while the trial court discussed in its opinion Mother's failure to complete the Mercy program, the trial court also notes that Mother had entered into mental health counseling just prior to the hearing, Trial Court Opinion at 8-9, and the court did not find that Mother was not in compliance with the mental health aspect of her family service plan as part of the rationale for termination of Mother's parental rights.

- 17 -

Having resolved that grounds for termination existed under Section 2511(a)(2), we now must proceed to the second part of the analysis under subsection (b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. . . . Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re G.M.S.*, 193 A.3d 395, 401 (Pa. Super. 2018) (citation and brackets omitted). "The mere existence of an emotional bond does not preclude the termination of parental rights[, and the trial] court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citations and quotation marks omitted). "Ultimately, the concern is the needs and welfare of a child." *In re M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019).

- 18 -

Mother argues that the trial court abused its discretion in concluding that termination of Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of Child because the trial court discounted the opinion of the sole psychological expert to testify, Dr. Bliss. As Mother recounts, Dr. Bliss opined that termination would be emotionally harmful for Child to lose his relationship with Mother, recommended an SPLC placement of Child with the foster parents, and stated that her recommendation would not change even if Mother had made false representations regarding her compliance with drug screens and visitation requirements. Mother further argues that the trial court erred in concluding that Mother's failure to maintain a regular visitation schedule in any way weakened the bond between her and Child as Dr. Bliss provided a first-hand report of the strong bond between Mother and Child despite the gaps in Mother's visitation.[6]

In making its determination that termination of parental rights was appropriate under Section 2511(b), the trial court engaged in the following discussion:

---

[6] Mother also argues that the trial court erred in stating that Child had been in care since June 2015, when in fact Child was born in June 2015 and was not removed from Mother's care until December 2016, when Child was approximately 18 months old. *See* Trial Court Opinion at 15. While the trial court's statement that Child was placed in care in June 2015 was in error, it also accurately stated the correct dates of Child's birth and removal from Mother's care elsewhere in the opinion. *See id.* at 2-3. We thus do not believe that the identified typographical error warrants reversal.

> Based on the evidence and testimony presented, this Court concluded that Child had developed a bond with his foster parents, who were able to provide Child with a loving, stable and secure home environment, while Mother's repeated failure to display a commitment to parenting, indications of substance abuse, and continued criminal behavior, would be detrimental to Child. In light of Mother's unreliability, her failure to comply with drug and alcohol treatment, and her inability to provide Child with an environment of stability and security, this Court concluded that termination of Mother's parental rights would be in the best interests of Child.
>
> Moreover, at the time of his removal from Mother's care, Child had not received all appropriate medical care, and it was foster parents who subsequently ensured that Child's medical care needs were met, and attended all necessary medical appointments, including speech therapy services.

Trial Court Opinion at 16.

The trial court recognized that Dr. Bliss testified that Mother had a strong bond with Child and exhibited proper parenting skills during Dr. Bliss's sessions with Mother and Child. Nevertheless, the trial court stated:

> Mother has repeatedly failed or refused to nurture and develop [] that bond in a manner beneficial to Child by failing to consistently visit[] with Child or otherwise make him a priority in her life. Although Mother indicates a willingness to try harder, our Superior Court has observed that courts "cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future.["] *In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013).

*Id.* at 13. The trial court further explained that Dr. Bliss's recommendation against termination of Mother's parental rights was premised upon Mother's statements to Dr. Bliss regarding her drug screens and visitation that was proven to be false by the credible information submitted by CYF. *Id.* at 12-13.

In light of our deferential standard of review and the case-by-case nature of the Section 2511(b) analysis focusing on the needs and welfare of the child above all other factors, we conclude that there was competent evidence to show that terminating Mother's parental rights was in Child's best interest. In making its determination that Child's interests would be best served by termination of Mother's parental rights, the trial court recognized that a bond existed between Mother and Child and severing that bond would be detrimental to Child. Nevertheless, the fact that a bond existed between Mother and Child does not act as a *per se* bar of the termination of Mother's parental rights. ***In re E.M.***, 620 A.2d 481, 485 (Pa. 1993); ***In re M.M.***, 106 A.3d 114, 118 (Pa. Super. 2014); ***see also In re T.D.***, 949 A.2d 910, 921-23 (Pa. Super. 2008) (terminating parental rights of parents in spite of bond between parents and child and harm that severing the bond will cause to child where a consideration of the totality of the circumstances demonstrated that the needs and welfare of the child would be best served by termination). Rather, the trial court acted within its discretion in balancing the harm of severing Child's bond with Mother with the loving, comfortable, secure, and stable home provided to Child by his foster parents. ***G.M.S.***, 193 A.3d at 401. Moreover, the trial court appropriately emphasized that the foster parents provided for Child's safety, wellbeing, and medical care, including by ensuring that he received speech therapy care. ***See In re K.Z.S.***, 946 A.2d 753, 763 (Pa. Super. 2008) (stating that the safety needs of the child are of a particular

concern in the Section 2511(b) analysis in cases were a child has special needs).

Furthermore, the trial court did not err in making its determination that the termination of Mother's parental rights best served the needs and welfare of Child in contravention of Dr. Bliss's recommendation against termination. In termination of parental rights cases, the trial court is not required to rely upon expert testimony. *In re D.L.B.*, 166 A.3d 322, 328 (Pa. Super. 2017). Furthermore, though Dr. Bliss stated that she would not support termination even if Mother had provided false information to her, the trial court acted within its authority as the ultimate arbiter of witness credibility and resolver of conflicts in the evidence in determining that Mother lacked veracity and that Dr. Bliss's opinion was undermined by the false assumptions on which it was based.[7]  Trial Court Opinion at 12.

In her final appellate issue, Mother argues that Child was deprived of his right to effective representation by counsel when his counsel argued in favor of termination of Mother's parental rights in spite of the opinion expressed by the lone psychological expert to testify that termination would not serve Child's best interests.  Mother contends that once Dr. Bliss stated

---

[7] Indeed, Dr. Bliss explicitly recognized during her testimony that the final determination of Mother's credibility rested with the trial court.  N.T., 1/11/19, at 89 ("Psychologists do not determine who is telling the truth.  That's not something we're allowed to do in an evaluation, so we leave that up to the judge to decide.").

her expert opinion, Child's counsel could not take a contrary position to that opinion based solely upon counsel's own assessment of Mother's credibility.

Under Section 2313(a) of the Adoption Act, 23 Pa.C.S. § 2313(a), an attorney must be appointed to represent a child's legal interest in an involuntary termination of parental rights proceeding. **T.S.**, 192 A.3d at 1092; **In re L.B.M.**, 161 A.3d 172, 180 (Pa. 2017). In **T.S.**, our Supreme Court held that, for a child who is non-verbal or too young to communicate his wishes in a termination proceeding, a guardian *ad litem* who is also an attorney may represent both the child's best interests and legal interest; in such cases, the Court explained, "there is no conflict between an attorney's duty to advance a subjective preference on the child's part which is incapable of ascertainment and an attorney's concurrent obligation to advocate for the child's best interests as she understands them to be."[8] 192 A.3d at 1090, 1092-93. In making this holding, the Court rejected the argument advanced by the mother

---

[8] The difference between legal interests and best interests has been defined as follows:

"Legal interests" denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation. "Best interests" denotes that a guardian *ad litem* is to express what the guardian *ad litem* believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees.

**T.S.**, 192 A.3d at 1082 n.2 (quoting Pa.R.J.C.P. 1154, Comment); **see also L.B.M.**, 161 A.3d at 174 n.2. Put another way, "a child's legal interests…are synonymous with the child's preferred outcome, and a child's best interests" must be determined by the trial court. **L.B.M.**, 161 A.3d at 174; **see also T.S.**, 192 A.3d at 1089.

facing termination of her parental rights that the law should presume the child who cannot communicate his preferences opposes termination, concluding that "it would be inadvisable for us to impose a legal presumption as to the preferred outcome of a child who is too young to formulate a subjective, articulable preference." *Id.* at 1090-92.

In this matter, Attorney Kelly Goodrich of the Allegheny County Office of Conflict Counsel's Juvenile Dependency Division, who had previously been appointed as Child's guardian *ad litem* in the dependency proceedings, also represented his legal interests at the January 11, 2019 termination hearing. Ms. Goodrich explained at the conclusion of the hearing that Child, who was approximately three-and-a-half years old at the time of the hearing and suffered from speech delays, was not able to state his preferred outcome and therefore there could be no conflict between Child's legal interest and his best interest. N.T., 1/11/19, at 156. Ms. Goodrich then proceeded to explain that she believed that CYF had met its burden of showing that termination of Mother's parental rights was appropriate under Section 2511(a) and (b), citing, among other factors, Mother's inability to comply with her visitation schedule and other parenting goals, her failed drug screens and poor record of attending these screens, and the safe and stable home provided for Child by the foster parents. *Id.* at 156-60.

We conclude that Child was not deprived of his statutory right to counsel as a result of the position taken by Ms. Goodrich in this proceeding. Mother cites to no authority that would impose a requirement that an attorney-

- 24 -

guardian *ad litem* representing a non-verbal child must conform her arguments as to the child's legal interests to be consistent with the recommendation of a testifying psychologist expert regardless of all other evidence admitted in the proceeding. Moreover, the Court's decision in **T.S.** counsels against adopting blanket presumptions regarding the preference of a non-verbal child in a termination proceeding. The record here reveals substantial support for Ms. Goodrich's argument, and the position ultimately adopted by the trial court, that CYF demonstrated by clear and convincing evidence that termination of Mother's parental rights was appropriate under Section 2511 of the Adoption Act.

Based on the foregoing, we conclude the trial court did not abuse its discretion or make an error of law in terminating Mother's parental rights to Child. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/22/2019